MR. JUSTICE DALY
delivered the Opinion of the Court.
The state appeals from an order of the district court, Lewis and Clark County, on January 23, 1974, to suppress evidence, i.e., marijuana. The evidence was seized by Robert Hillis, manager of McDonald’s Restaurant, from a coat belonging to defendant hanging in the manager’s office of the restaurant located in Helena, Montana.
The. Montana County Attorneys Association filed a motion with this Court for leave to appear, file a brief, and make oral argument amicus curiae. Its motion was granted.
Defendant Donald Leroy Coburn was employed as an assistant manager at McDonald’s Restaurant located in Helena. Supervisor was the manager, Robert Hillis. While at home between 4:00 and 6:00 p.m., on November 29, 1973, Hillis received a phone call from Jason Keller, another assistant manager of McDonald’s, alerting him that defendant had some marijuana on the restaurant’s premises. Hillis then called the owner of the store in Billings to inform him of the problem and ask his advice.
Following his conversation with the owner, Hillis went directly to the Helena police department and spoke with one Sgt. Sanguine. The transcript shows this examination of Hillis:
“Q. As closely as possible, would you tell the Court what you said to the officer? A. Okay, I went down and I told him who I was and I told Mm that there was marijuana in the store and that I didn’t want to get the store involved, you know, any more than necessary, and we talked about whether it was legal for him to go get it, and he said that he couldn’t for some legal reason and we talked about whether I should, and he didn’t know whether that was legal or not for sure and he *490 called somebody and talked to them, I don’t remember who it was and I don’t remember whether we ever came to a definite decision as to whether 1 should get it or forget it or what, and I wasn’t going to leave it in the store, I couldn’t have it in the store because if the other kids, if any of them knew about it, because if one can do it they might all do it.”
On cross-examination, Hillis testified:
“Q. I am trying to get some idea, you know, of what your frame of mind was when you left the police department. A. Well, I would have gotten it out of there one way or the other, if the police wouldn’t I would have gotten it out myself.
«# # # '
“Q. Now, you have testified that you had some conversation with the officer about whether or not you should remove this package? A. Right.
“Q. And you also testified that you don’t remember what conclusion was reached? A. No.
“Q. Well, could you say whether or not you had the feeling when you left the police department that you should do it? A. I had the feeling I was going to, I knew I was going to.”
On redirect:
“Q. On this last topic you stated that at the police station or thereafter you went back with the idea of removing the marijuana. Had you formed that idea prior to going to the police station, the general concept that the marijuana should be removed from the premises? A. Tes, before I even went to the police station, definitely.
“Q. So, it wasn’t as a result of your conversation at the police station that you decided to remove the marijuana? A. No, absolutely not.”
On recross:
“Q. And if the police had taken steps or had told you they would take steps, then I presume you wouldn’t have taken any action to remove it? A. Right.”
*491 On cross-examination Sgt. Sanguine testified:
“Q. Did he ask for any advice as to what to do? A. Well, he didn’t want to, he didn’t want the police to enter the premises because of the possibility of bad publicity for the company, but he just wanted us to know he was going to go down there.
“Q. Okay, and what did you do, what did you respond to that? A. Well, I advised him that under the circumstances that if he didn’t want us to enter into it, he would be mainly on his own as to how he wanted to handle it.
# *
“Q. Could you tell us, well, is there anything do you remember any parting words when he left the police station? A. When he left, he was still undecided about how he was going to handle it and I did advise him if he wanted us to that we could wait until Mr. Coburn got off duty and we would confront him down off the premises.
“Q. Did you feel you had, based on your experience as a police sergeant, did you feel that you had sufficient cause at that time to attempt to seize the substance? A. I feel that if he could allow us to enter the premises, we could have.”
On recross:
“Q. I take it that when he came in and told you these problems and the fact that he didn’t want his company involved, that there ensued a discussion about a seizure of these packages by himself, and rather than a seizure of the packages by you, is that true? A. Well, I didn’t advise him to do it that way.
“Q. That’s right, I understand that, but what I want to know is what was said about him doing it. A. Well, I don’t believe at the time he really didn’t know what he was going to do, I can’t say there was too much discussion on him removing it.
“Q. Did you expect him when he came back with the stuff? A. No, I didn’t really, I didn’t think he would come back.” (Emphasis supplied).
*492 Following his conversation with Sgt. Sanguine, Hillis left the police station and went to the restaurant; upon arriving there, he entered the manager’s office. This office was a private office to which only the manager and assistant managers had unlimited access. Hillis then saw defendant’s coat hanging on the wall. He could see a bulge in the hip pocket. He removed the substance, later determined to be marijuana, from defendant’s coat without a search warrant or without express or implied consent from defendant. Hillis then returned to the police station and turned the marijuana over to the police.
In its order suppressing this evidence the district court said in part:
“It is the opinion of this Court that the rule adopted by the Montana Supreme Court in the Brecht case applies in the case at bar, therefore, it is
“ORDERED that the motion to suppress the evidence obtained by the search be and the same is hereby granted.” (Emphasis added).
There is but one issue presented by the state in this appeal: Did the district court err in suppressing the evidence seized by Robert Hillis, relying on this Court’s decision in State v. Brecht, 157 Mont. 264, 270, 485 P.2d 47 (1971) 1
This case is unique in that the state and amicus curiae attack only the Brecht decision. They ask that it be reversed and confine their arguments in that regard only to the application of the Fourth Amendment to the Hnited States Constitution, ignoring any other considerations. This would indicate that Brecht, as written, is not clear and an explanation is warranted even though the instant case can be distinguished.
In Brecht the defendant was charged with the murder of his estranged wife. Her death resulted from the discharge of a shotgun under disputed circumstances in the tavern where she was employed on the evening of May 17, 1967. Deceased and her sister Sandra resided with their mother at the mother’s home for a period of time before the shooting. The sister *493 Sandra received a call at the mother’s home from the defendant on the evening of April 29, 1967, some two weeks prior to the shooting incident; he asked to speak with his wife and Sandra called her to the telephone. Without the consent of either party, Sandra proceeded to listen to the conversation on an extension telephone in another room. At trial Sandra was permitted to relate the conversation which she alleged contained this threat by defendant “I got my shotgun out off hock, I am coming down and I will use it if I have to”.
In Brecht the state agreed that had this intrusion and the conversation overheard been obtained by an agent of the state it would have been excluded by the court because of the ruling in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Katz is an electronic surveillance case and the landmark case that overturned the longstanding doctrine that search and seizure under the Fourth Amendment was unreasonable only if an intrusion or trespass accompanied the seizure of “tangible goods” i.e., indicating a property right or enclave theory. Katz held these rights to be personal and protective of people and not simply areas with no physical intrusion required. Brecht excluded the conversation of Sandra Brumfield based on violation of defendant’s right of privacy established in Welsh v. Roehm, 125 Mont. 517, 241 P.2d 816, a court declared constitutional right; the Fourth and Fifth Amendments of the United States Constitution; Art. Ill, Sec. 7 of the 1899 Montana Constitution; and stated in pertinent part:
“* * * The violation of the constitutional right to privacy and against compulsory self-incrimination is as detrimental to the person to whom the protection is guaranteed in the one case as in the other. To distinguish between classes of violators is tantamount to destruction of the right itself. * '* *
“This Court in the present case would be remiss were it not to recognize that evidence obtained by the unlawful or unrea *494 sonable invasion of several of tbe constitutionally protected rights guaranteed to its citizens by both the federal and Montana constitutions properly comes within the contemplation of this Court’s exclusionary rule. To do otherwise would lend Court approval to a fictional distinction between classes of citizens: those who are bound to respect the Constitution and those who are not. Were the exclusionary rule to recognize such distinctions it would by indirection circumvent the rule established by this Court to enforce these rights and would in fact render the rule and the constitutional guarantees it protects meaningless.”
The state and amicus curiae proceeded in argument on the premise that Brecht rested solely on the Fourth Amendment cases which establish this general rule, contained in 68 Am.Jur.2d, Searches and Seizures § 13, p. 670:
“It is no part of the policy underlying the Fourth Amendment to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals. Accordingly, it has long been recognized that the Fourth Amendment’s protections against unreasonable search and seizure do not extend to a search or seizure made by a private individual, conducted without police.participation. In support of this rule, it has been said that the origin and history of the Fourth Amendment clearly show that it was intended only as a restraint upon the activities of sovereign authority, and that a contrary ruling would have no deterrent effect since private persons would be unaware of the rule * # (Emphasis added).
The general rule and cited cases are based on the holding of the United States Supreme Court in Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).
The state and amicus argue that Brecht was improvident and against the weight of authority. A careful reading of Brecht reveals that this is an oversimplification of the problem. As heretofore stated Brecht rested only in part on the Fourth Amendment and it would appear that any attempt to reverse *495 Brecht would necessarily require a treatment of additional constitutional considerations upon which the Brecht decision rests and, further, a consideration of the legal issues raised by defendant here. Defendant contends the search violated these constitutional and statutory provisions:
Article II, Sec. 10, 1972 Montana Constitution:
“Right of Privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state intérest.”
Section 95-701, R.C.M.1947:
“Searches and seizures — when authorized. A search of a person, object or place may be made and instruments, articles or things may be seized in accordance with the provisions of this chapter when the search is made:
“(a) As an incident to a lawful arrest.
“(b) With the consent of the accused or of any other person who is lawfully in possession of the object or place to be searched, or who is believed upon- reasonable cause to be in such lawful possession by the person making the search.
“(c) By the authority of a valid search warrant.
“(d) Under the authority and within the scope of a right of lawful inspection granted by law.”
Defendant’s contentions raise some interesting problems when considered with the fact that Montana has a statute, section 95-611, R.C.M.1947, which provides:
“95-611. Arrest ~by a private person. A private person may arrest another when:
“(1) he believes, on reasonable grounds, that an offense is being committed or attempted in his presence;
“(2) a felony has in fact been committed and he believes, on reasonable grounds, that the person arrested has committed
Also., the federal constitution contains no specific section establishing a separate and independent right of privacy as does the 1972 Montana Constitution. The United States *496 Constitution recognizes the right as part of the First, Third, Fourth and Fifth Amendments. Katz v. United States, supra.
The state in oral argument cited a Montana Law Review note at 34 Montana Law Review 187, which it advised the Court also represented the state’s view as an in depth discussion of Brecht and the exclusionary rule.
The totality of the state, amicus and law review article arguments reduce themselves to:
(1) The exclusionary rule is not a completely satisfactory rule and represents an attempt to solve a problem that defies simple solution. The conflicting policy considerations are the interest of society in criminal prosecutions and the prohibiting of law enforcement personnel from violating Fourth Amendment proscriptions, a proscription extended to right of privacy as well. The intent of the rule was to remove the incentive for officers to violate the rule and deter official misconduct and promote “judicial integrity”. Logic would dictate that to fulfill the function of the rule the persons violating the rule must have an interest in obtaining the conviction and must at least be aware of the rule.
(2) They adopt the strict construction doctrine of the general rule that the authors of the Fourth Amendment, fearing an oppressive sovereign, meant only to give limited protection from government action. The United States Supreme Court in Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048, said:
“The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his *497 dwelling and the possession of his property, subject to the right of seizure by process duly issued.” (Emphasis added).
A fair analysis of the arguments would seem to imply that the position of the parties was much the same as that expressed by Chief Justice Taft, writing for the majority in a five-four decision, Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 954 (1928), a telephone intrusion case by federal officers, where he held the Fourth Amendment not subject to application beyond the intent of the framers of the amendment and its words could not be stretched to be given a meaning to include “intangible” and trespass was a requirement to invade the protected property.
All parties in the instant case have avoided any analysis of Katz in which, Justice Black in his dissenting opinion proclaims that the majority in Katz have “rewritten the Fourth Amendment”. Justice Black in his dissent also relied heavily on Olmstead.
It would appear then that the arguments based on strict interpretation, origin, history, and intent of the authors as they concern the Fourth Amendment are highly diluted since Katz in 1967. The majority in Katz recognize that the former decisions of the Court foreclosed Fourth Amendment inquiry when penetration or trespass was absent, citing Olmstead and Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, for the Amendment was thought to limit only searches and seizures of tangible property and property rights controlled. The majority, in Katz, cited Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734, as the departure from that narrow view and included intangibles as well. It went on to hold that the Fourth' Amendment protects people and not simply “areas” and therefore the reach of the Fourth Amendment cannot turn upon the presence or absence of physical intrusion into any given enclosure, and the trespass doctrine in Olmstead and Goldman can no longer be controlling.
This then demonstrates a radical departure from the accepted *498 meaning of the words of the Fourth Amendment which, con-, trolled for over a period of 40 or more years, since Olmstead. It further demonstrates that these traditional concepts are mot static. This is not a new concept by any means. In Olmstead, many years ago, among the four dissenting justices, Brandéis observed in reference to interpretation on the same subject as Katz:
“Clauses guaranteeing to the individual protection against •specific abuses of power, must have a similar capacity of adaptation to a changing world. It was with reference to such a ■clause that this court said in Weems v. United States, 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed. 793, 801: ‘Legislation, both statutory and constitutional, is enacted, it is true, from -an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new ■conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of. Constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, “designed to approach immortality as nearly as human institutions can approach it.” The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a Constitution, therefore, our contemplation cannot be only of what has been but of what may be. Under any other rule a Constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas. Bights declared in words might be lost in reality.’ ” (Emphasis added).
So far as privacy is concerned, Katz recognized the Fourth Amendment was not a general right of privacy but the right was contained in the Fourth and several other amendments, the First, Third and the Fifth, and as stated in Katz at p. 350 *499 of 389 U.S., at p. 511 of 88 S.Ct., at p. 581 of 19 L.Ed.2d in reference to the right of privacy: “# # * his right to be let alone by other people — is, like the protection of his property and of his very life, left largely to the law of the individual States.”
In Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Court noted that the Fourth and Fifth Amendments were very closely tied and the unreasonable search and seizure of the Fourth Amendment almost always compels a man to give evidence against himself which is condemned in the Fifth Amendment- In this regard the Fourth and Fifth Amendments almost run into each other. This adds to the problem the fact that a violation of the Fifth Amendment rights, whether private or government, is condemned in all courts, military and civil. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958).
Concerning the exclusionary rule itself, it would be well to consider first that the “exclusionary rule” is a court adopted rule resting on the “rule making” and “supervisory power” of the Supreme Court over the other courts and has no roots in the constitution or the statutes of the state or federal government. (Dissent in Katz by Justice Black and citing Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782; Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933; Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, 1677, 1680, 1681 (1960).
The fact that the rule is characterized as not satisfactory and the state in argument recommended that a tort remedy for the aggrieved was adequate, simply ignores that all of the cases which declare the rule as a deterrent because the wrong cannot be corrected or compensated, but merely avoided in the future, must have recognized that there could be no price placed on a constitutional right.
*500 The court in People v. Cahan, 44 Cal.2d 434, 282 P.2d 905 (1955), observed that the court was compelled to apply the rule because all remedies, such as criminal and tort, had completely failed to secure these rights under the Constitution. Cahan was cited and approved in Elkins with a long discussion on the problem, citing statements from the chief law enforcement officers of California and the FBI in support of the rule.
In Elkins, the court said: •
“The exclusionary rule has for decades been the subject of ardent controversy. The arguments of its antagonists and of its proponents have been so many times marshalled as to require no lengthy elaboration here.”
It is, however, noteworthy to comment on its application and the “silver platter doctrine” that resulted. The first application of the rule, in 1914, applied only to the federal court system and only excluded tainted evidence obtained by federal officers and as a result the so-called “silver platter doctrine” was developed, i.e., state officers could violate a person’s constitutional right and hand the evidence to the federal officers [on a silver platter] and such evidence could be used in the federal court because no federal officer was physically involved in the violation.
This practice was recognized but ignored for over 40 years until Elkins. In that case, the “silver platter doctrine” was finally discredited. Elkins went on to observe that it is unlikely factual data could be assembled to demonstrate that the exclusionary rule was unworkable and in some depth demonstrated the opposite conclusion. Of more interest, Elkins cites with approval as a ground for rejecting the so-called “silver platter doctrine”:
“But there is another consideration — the imperative of judicial. It was of this that Mr. Justice Holmes and Mr. Justice Brandéis so eloquently spoke in Olmstead v. United States, 277 U.S. 438, at pages 469, 471, 48 S.Ct. at pages 569, 570, 72 L.Ed. 944, 952, 953, [66 A.L.R.376], more than 30 years ago. ‘For *501 those who agree with me/ said Mr. Justice Holmes, ‘no distinction can be taken between the Government as prosecutor and the Government as judge.’ 277 U.S. at page 470, 48 S.Ct. at page 575. (Dissenting opinion.) ‘In a government of laws/ said Mr. Justice Brandéis, ‘existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means ■ — to declare that the government may commit crimes in order to secure the conviction of a private criminal — would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.’ 277 U.S. at page 485, 48 S.Ct. at page 575. (Dissenting opinion.)”
Elkins also cites McNabb v. United States, 318 U.S. 332, 345, 63 S.Ct. 608, 87 L.Ed. 819, in support of this doctrine and then concludes:
“Even less should the federal courts be accomplices in the willful disobedience of a Constitution they are sworn to uphold.”
Of course, this would apply to all of the court systems.
In Mapp, shortly after Elkins, the last door was closed and the exclusionary rule was applied to the state courts. The rule may have many of the deficiencies that are contended by the state, but a close examination of its history would seem to present a strong case that once the rule was formulated the unexplained, uneven and ignoble application by the judiciary lent no strength to the rule and it is certainly no compliment to judicial integrity to admit to the inordinate length of time that the “silver platter doctrine” was ignored.
Incidental to this matter the state commented with emphasis in its brief, that State v. Gardner, 77 Mont. 8, 249 P. 574 (1926), *502 was not considered in Brecht but was by implication overruled by Brecht. The Supreme Court of Montana had adopted its own exclusionary rule at that time, long prior to Mapp, and did quote from Burdeau, the foundation case, for the general rule quoted in Gardner. However, Gardner involved the “silver platter doctrine” in the use of illegally obtained evidence by the federal authorities in a state court and used Burdeau to justify this action in an entirely different context than that under consideration in Brecht. It would seem fair to assume that Elkins overruled, not Brecht.
The argument that the exclusionary rule is wedded to the sovereign because the organized officialdom are the only ones that can be deterred because the injury to the victim cannot be restored or reparation comes too late, and that all others would have no prosecution motive and could not be familiar with the rule is an unwarranted generalization that completely disregards the changes that have taken place in our political and social structure and the legal impact of the cases on the subject since the rule was announced in Burdeau in 1921; with particular reference to Katz and Elkins. It also follows that no consideration is being given to the cases cited, including Brecht, where there is a merger of the Fourth and Fifth Amendments in a violation of a personal right, particularly when authority cited by the state agrees that Fifth Amendment violations are excluded when done by a private person. No thought is given to the Montana Constitution or statutes previously cited. Finally, it fails altogether to recognize the massive increase in the incidents of the invasions of the right of privacy of the private citizen or the scientific advances that have made this possible, even though the United States Congress has finally recognized the problem and has given it priority consideration.
Further, the arguments erroneously characterize the “private person” as the little old lady next door who has a desire to assist in law enforcement. When in fact a great many of *503 the pure Fourth Amendment cases cited by the state involve-“institutional”, “quasi” or “private” police, i.e., airport guards, building security personnel, private detectives and we also have-private corporation police like railroad police and self-help-groups and investigators for political committees. Experience-simply does not cast these groups of “private” persons in the-minority. The standards agreed to by the state simply do not fit this segment of the private sector. Methods designed to-protect the multiple rights of the whole of our citizenry are-not intended to free criminals or discourage the participation: of citizens in the enforcement of our laws.
If one considers that any exclusionary process only excludes-“unreasonable” conduct it can readily be seen that all intrusions; are not unreasonable. Like it or not unreasonable or illegal intrusions knowingly accepted and used, from the private sector-by the government amount to an extension of the silver platter-doctrine condemned by Elkins, particularly when viewed in the light of judicial integrity emphasized in Elkins. It has been argued that Elkins did not disturb Burdeau, it may not have-been clear in the pure Fourth Amendment context, but a close examination does move one to believe that the silver platter concept was condemned in any context.
This Court, however, does recognize the multitude of problems that arise and have arisen over the decades in an attempted solution of this very difficult problem and a final solution may-well require that recognition be given to the wide disparity-in terms of knowledge, motive and awareness of the widely^ diverse groups, institutions and individuals sought to be controlled and collusion avoided by the exclusionary rule.
If personal rights are to be protected and governmental integrity preserved the answer does not lie in ignoring the problem,, as did the federal system for so many years, but a possible-examination of the rigidity of the rule itself might be in order. The solution could very well be partially achieved by an examination of standards for reasonableness in these matters appli *504 cable to government on the one hand, institutional police and private persons as we move down in this diverse process. This is much the same problem to be faced under a statutory “private” arrest, when it involves a search and seizure incident thereto.
The Court is mindful that by respondent’s brief and case analysis there have been constitutional and statutory questions raised that bear directly on this problem which we have not answered. Under the facts and circumstances of this case, we feel that we should not and therefore have not done so.
As stated at the beginning of this opinion, the instant case can be distinguished from Brecht. It might be well to establish that it is distinguished on legal grounds. The Court does not call into question the good faith or integrity nor offer criticism of any of the parties here involved, for whatever personal reasons controlled the decisions made that night.
The testimony clearly reveals two outstanding departures from the doctrine urged by state and amicus.
(1) The transcript quoted reveals the reporting of a crime to the proper authority, with abundant probable cause for arrest procedure. At this point a crime against the state, not McDonalds, was involved. The public interest thereafter was subordinated to that of a private interest when the store manager was permitted the luxury of self-help. No matter how laudable the motives, there is no proof that adverse publicity would have been any greater had the matter been handled by the police. There is no legal difference if the crime reported had been a deceased person by unnatural means. After the manager obtained the drug it was promptly turned over to the police. This then is not the example used in argument of an innocent assist to the government with no conviction motive, or why else the initial report and the delivering of the evidence for prosecution.
(2) The conference with officials beforehand defeats, at least impliedly, the ignorance of the rule concept. Further the *505 state endorsed in its cited law review article, 34 Montana Law Review 187, 197, while explaining private cooperation with the police creates less of a problem than might be imagined, that:
“* * * As soon as a private individual acts in association or cooperation with the police, the courts have held that his act is deemed to be the act of the state. Miramontes v. Superior Court for County of San Mateo, 25 Cal.App.3rd 877, 102 Cal. Rptr. 182 (1972).] Not only will evidence be excluded if a private individual works at the direction or supervision of the police, but it will also be excluded when the police are guilty of no more than just ‘idly standing by’ ”.
Stapleton v. Superior Court of L.A. County, 70 Cal.2d 97, 73 Cal.Rptr. 575, 447 P.2d 967, 970 (1969); State ex rel. Sadler v. District Court, 70 Mont. 378, 225 P. 1000 (1924).
Admittedly the facts of the case presented by the state through the law review article are much stronger than ours. However Stapleton does hold:
“* # # police need not have requested or directed the search in order to be guilty of ‘standing idly by’; knowledge of the illegal search coupled with a failure to protect the [defendant’s] rights against such a search suffices.”
The legal impact drawn from all of the facts seems to come much more under Stapleton than Brecht, however, in either case the district court was not in error.
The judgment of the district court is affirmed.
MR. JUSTICE HASWELL and the HONORABLE M. JAMES SORTE, District Judge, sitting for MR. CHIEF JUSTICE JAMES T. HARRISON, concur.