No. 82-36

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

vs.

THOMAS VAN HAELE,

Defendant and Appellant.

---

Appeal from:   District Court of the Thirteenth Judicial District,
               In and for the County of Yellowstone
               Honorable Diane G. Barz, Judge presiding.

Counsel of Record:

For Appellant:

Keefer, Roybal, Hanson, Stacey & Jarussi, Billings,
Montana
Calvin Stacey argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, argued, Helena,
Montana
Harold F. Hanser, County Attorney, argued, Billings,
Montana

For Amicus Curiae:

Mark J. Murphy, County Prosecutor Services Bureau,
Helena, Montana

---

Submitted:   May 20, 1982

Decided:   August 23, 1982

Filed: AUG 23 1982

_Thomas J. Kearney_
                        Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant appeals from his conviction of criminal possession of dangerous drugs with intent to sell in violation of section 45-9-103, MCA. We reverse.

The facts of this case are uncontroverted. Robert and Mae Westfall were the managers of Shurgard Mini Storage in Billings, Montana, a collection of storage units which are rented out to customers. In January 1981, the Westfalls rented a unit to defendant who identified himself as "Bill Hayes."

On July 31, 1981, at closing time, defendant arrived at Shurgard and was given permission to go to his unit. Because Mae Westfall had earlier instructed another customer (Bender) to lock the gate when he left, Mae Westfall went to inform Bender of defendant's presence. After doing so, she noticed the door to defendant's unit was shut and wondered what he was doing, since there were no interior lights in defendant's unit. Mrs. Westfall also wanted to know how much longer defendant was going to be on the premises.

Mrs. Westfall walked to the door of defendant's unit, knocked and said, "Hey, you in there." There was no response so she repeated the procedure with no result. She then opened the door and saw defendant sitting on the floor, pointing a gun at her. She also saw two suitcases on the floor behind him but was unable to describe them because of the dimness of the room's interior. She then yelled for Bender, who tried to wrestle the gun from defendant. Mrs. Westfall left to inform her husband who in turn called the police. The police arrived after defendant

had left but the Westfalls informed them that they did not wish to press any charges at that time.

Pursuant to company policy, Mrs. Westfall called the Washington home office on the next working day and related the events to them. Personnel at the home office suggested the Westfalls find out what was in the suitcase. Mr. Westfall removed the hinge pins from the padlocked door and entered defendant's unit. He opened one of the suitcases and saw a number of bottles of pills. He also opened a purse lying on the floor which he found to contain silverware. After closing the suitcase, purse and replacing the door, Mr. Westfall called the police indicating that they now wished to press assault charges.

Based on the information provided by the Westfalls, the Billings police obtained a search warrant and seized the suitcase and purse. The contents of the suitcases and purse were inventoried, revealing well over 100 bottles of pills and on August 8, 1981, defendant was charged with criminal possession of dangerous drugs with intent to sell. Defendant pleaded not guilty and filed a motion to suppress. The court denied the motion and, after a nonjury trial, sentenced the defendant to fifteen years in the Montana State Prison and designated him a dangerous offender. Defendant appeals.

Defendant raises two issues on appeal which can be stated as follows:

1. Whether the District Court erred in failing to suppress the evidence.

2. Whether the District Court erred in adopting the State's proposed findings of fact and conclusions of law.

With regard to the first issue appellant argues that Montana's position on "citizen searches" mandates a reversal,

citing State v. Hyem (1981), ___ Mont. ___, 630 P.2d 202, 38 St.Rep. 891; State v. Helfrich (1979), ___ Mont. ___, 600 P.2d 816, 36 St.Rep. 1763; State v. Coburn (1974), 165 Mont. 488, 530 P.2d 442; and State v. Brecht (1971), 157 Mont. 264, 485 P.2d 47. These cases all stand for the proposition that evidence obtained by a private citizen in violation of another's constitutional rights is subject to the exclusionary rule and may not be admitted into evidence in a criminal trial in this state. The fact that Montana's constitution explicitly guarantees an individual's right to privacy was a major factor of the Hyem and Helfrich decisions:

> "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest. 1972 Montana Constitution, Article II, Section 10."

The State concedes that, if we follow Hyem and its predecessors, the defendant's conviction must be reversed but argues that we should reverse those cases and allow evidence illegally obtained by private citizens to be admitted in a criminal trial. The State further argues that the exclusionary rule deterrence rationale (to deter police from violating other's constitutional rights by excluding the evidence) has no application to private citizens because they do not realize the evidence is suppressible.

We decline to overrule our previous citizen search cases and reaffirm our position taken therein. We base our reasoning on the firm stance taken by the Montana Constitution guaranteeing an individual's right of privacy. Our holding today is also rooted in the concept of judicial integrity, i.e., the judicial system must not become an

-4-

accomplice to constitutional violations by admitting evidence illegally obtained.

It is clear from the seminal cases involving the exclusionary rule that judicial integrity was one of the main reasons for the exclusion of illegally obtained evidence. In Weeks v. United States (1914), 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed.~~X~~ 652, the issue was whether evidence obtained unconstitutionally by government agents should have been admitted at trial. The Court found that it should not have been admitted and stated the following:

> "To sanction such proceedings would be to affirm by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action."
> 232 U.S. at 394, 34 S.Ct. at 345, 58 L.Ed. at 656.

Later in Elkins v. United States (1960), 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, the court outlawed the "silver platter doctrine" whereby evidence illegally obtained by state officers would be turned over to federal prosecutors in federal criminal trials. In so doing, the Court stated:

> "But there is another consideration--the imperative of judicial integrity. It was of this that Mr. Justice Holmes and Mr. Justice Brandeis so eloquently spoke in Olmstead v. United States, 277 U.S. 438, at 469, 471, more than 30 years ago. 'For those who agree with me,' said Mr. Justice Holmes, 'no distinction can be taken between the Government as prosecutor and the Government as judge.' 277 U.S., at 470. (Dissenting opinion.) 'In a government of laws,' said Mr. Justice Brandeis, 'existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; invites anarchy. To declare that in the administration of the criminal law the end justifies the means--to declare that the Government may commit crimes in order to secure the conviction

of a private criminal--would be terrible retribution.
Against that pernicious doctrine this Court should
resolutely set its face." 277 U.S. at 485.
(Dissenting opinion.) 364 U.S. at 222, 223, 80
S.Ct. at 1447, 4 L.Ed.2d at 1680-81.

We said in Coburn, supra, in commenting on the above

quote:

> "[U]nreasonable or illegal intrusions
> knowingly accepted and used, from the private
> sector by the government amount to an
> extension of the silver platter doctrine
> condemned by Elkins, particularly, when
> viewed in the light of judicial integrity
> emphasized in Elkins." (Emphasis in original.)
> 165 Mont.at 503, 530 P.2d at 450.

The next landmark case in the development of the exclu-

sionary rule was Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct.

1684, 6 L.Ed.2d 1081, which made the exclusionary rule

binding in both state and federal cases. The concept of the

judiciary remaining free from the taint of illegally seized

evidence played a large part in the decision as revealed by

the Court's concluding statement:

> "Our decision, founded on reason and truth,
> gives to the individual no more than that
> which the Constitution guarantees him, to
> the police officer no less than that to which
> honest law enforcement is entitled, and, to
> the courts, that judicial integrity so necessary
> in the true administration of justice." 367
> U.S. at 660 81 S.Ct. at 1694, 6 L.Ed.2d at 1093.

See Terry v. Ohio (1968), 392 U.S. 1, 13, 88 S.Ct. 1868,

1875, 20 L.Ed.2d 889, 901 ("A ruling admitting evidence in a

criminal trial, we recognize, has the necessary effect of

legitimizing the conduct which produced the evidence, while

an application of the exclusionary rule withholds the

constitutional imprimatur").

We find the following in McCormick on Evidence has

this to say in the concluding paragraph in the section on

evidence obtained by private individuals:

> "On balance, the factors seem to favor
> the imposition of the exclusionary rule.
> Although the situation is distinguishable
> from that in Mapp, the distinction is not
> of sufficient breadth to justify a drastic
> difference in the treatment of the resulting
> evidence. While the need to protect personal
> security from private as well as public
> invasion is certainly an important factor, the
> controlling matter is the unfairness of the
> use of the evidence and the degrading of
> the judicial system that must necessarily
> accompany that use." (Emphasis added.)
> McCormick on Evidence § 168, at 374.

Here there were two methods used in unlawfully gaining access to defendant's rental unit. Mr. Westfall removed the hinge pins on the door for the first entry and cut defendant's padlock off the door for the second. It is hard to imagine more blatant violations.

It is uncontroverted here that the Westfalls had no idea that they would find any drugs in the suitcases. When Mrs. Westfall first knocked on and opened the door, the light was so dim that she could not describe the suitcases behind the defendant. Defendant's unit had no interior light and no windows and one needed to crawl in or out to enter or exit it. We note that defendant has already been convicted and sentenced on the assault charge for pointing the gun at Mrs. Westfall.

To sanction the admission of the evidence gained in this unlawful manner by allowing its presentation in a criminal trial makes the courts of this state a party to violations of the constitutional rights of the defendant and runs afoul of any viable notion of judicial integrity as outlined in Coburn, supra.

It is also undisputed in the case at bar that the defendant's right to privacy was violated. Defendant is guaranteed this right under Art. II, § 10 of our state

-7-

constitution, supra. Of the ten states expressly protecting privacy in their constitutions, only two (Alaska and Montana) have privacy guarantees that stand alone in a separate section of the state constitution, A Right of Privacy as a Matter of State Constitutional Law (1977), 5 Fla.St. L.Rev. 631, 690-701. Although the Alaska courts have apparently have interpreted their constitution to require state action to trigger the exclusionary rule, Allred v. State (Alaska 1976), 554 P.2d 411, 416, we believe the better approach is that followed in Brecht and its progeny, supra. Montana's privacy right is the most elegant and the most uncompromising of the various privacy statements. 5 Fla.St. L.Rev. at 738.

Respondent contends that we should adopt the good faith approach to the exclusionary rule approved by the Fifth Circuit in United States v. Williams (5th Cir. 1980), 622 F.2d 830. We are not persuaded by this argument. As discussed above, Montana's constitutional guarantee of privacy is expressed in the strongest terms of any state constitution in the country and we are not bound by federal interpretations from other circuits.

Statistics show that most motions to suppress are concentrated in offenses involving narcotics, weapons and gambling (with one-half filed in crimes involving narcotics and weapons), persuasive evidence that the application of the exclusionary rule is concentrated in these few areas, Studying the Exclusionary Rule in Search and Seizure (1970), 37 Univ. of Chicago L.Rev. 665, 706.

These circumstances usually arouse little if any public support or sympathy for the defendant whose rights are violated. However, in a different context, the question of

the admission of illegally obtained evidence is less volatile. For example, say an employee of a bank breaks into another's safety deposit box and discovers a stolen watch, a clear constitutional violation. Are the rights of pusher or murderer any less than the watch thief's simply because our society today views the latter crime as innocuous and less heinous? Our Constitution was not grounded on such shifting sand.

To admit at a criminal trial evidence illegally obtained by private citizens is to encourage a vigilante movement which has no redeeming social value in our society today. Moreover, many prosecutors in this state would refuse to base a charge or information on such evidence but there are some who persist in doing so.

The State argues that by not allowing the fruits of an unlawful citizen's search into evidence, many would-be criminals are allowed to go free. However, two recent studies indicate that the exclusionary rule has a negligible effect in freeing defendants. One study surveyed nearly 3,000 cases in 38 United States Attorney's offices between July 1 and August 31, 1978. Only 1.3 percent had evidence suppressed because of Fourth Amendment violations and more than half of the defendants who successfully moved to suppress were convicted anyway, Comptroller General of the United States, The Impact of the Exclusionary Rule in Federal Criminal Prosecutions, rep. no. 66D-79-45 (April 19, 1979). Another study found that less than one percent of all arrests were eliminated for no follow-up prosecution because of due process violations such as illegal searches and seizures, Frost Lucianovich & Cox, What Happens After Arrest? (Wash. D.C. Art. for Law and Social Research, August 1977).

National figures show that only 2 percent of the total number of persons held for prosecution were charged with weapons or narcotics offenses, the crimes where the exclusionary rule is applied most often, 37 Univ. of Chicago L.Rev. at 681. In view of these facts, the State's argument that many criminals are set free because of suppression of illegally-seized evidence due to the exclusionary rule loses much of its force. Also, statistics covering twelve years of law enforcement activity in Cincinnati, Ohio, show that the adoption of the exclusionary rule had no apparent effect on arrests or convictions in narcotics, weapons and gambling offenses, 37 Univ. of Chicago L.Rev. at 707.

Appellant argues that no probable cause existed to support the issuance of the search warrant in this case and it follows from what we have said above that we agree. The warrant was based on evidence illegally obtained by Mr. Westfall and the warrant was tainted thereby. See United States v. Crews (1980), 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537.

Appellant's second issue relates to whether the District Court erred in adopting the State's proposed findings of fact and conclusions of law. Appellant argues that this action violates the rule of law set forth in Tomaskie v. Tomaskie (1981), ____ Mont. ____, 625 P.2d 536, 38 St.Rep. 416. The State concedes its proposed findings and conclusions were accepted by the District Court with only minor changes.

We note that subsequent to the Tomaskie case, this Court decided Jensen v. Jensen (1981), ____ Mont. ____, 631 P.2d 700, 38 St.Rep. 1109, wherein we stated that such an adoption is not grounds for reversal if the findings and

conclusions are sufficiently comprehensive and supported by the evidence. It is clear from what was said above that the District Court's decision is not supported by the evidence or the law and thus fails to comport with this standard.

Reversed.

_____
Chief Justice

We concur:

_____


_____


_____
Justices

Mr. Justice John C. Sheehy concurring:

I agree most emphatically with the foregoing opinion.
It is near an absolute that in this country and in this state
a judicial system would condemn the admission of evidence
secured by trespassers who here used methods usually employed
by burglars to gain entrance into defendant's private domain.

We were told in oral argument by the State that a decision
favoring the defendant in this case would dampen the efforts of
"Crimestoppers", a program designed to utilize informers in
crime detection. I particularly reject that contention. The
"Crimestoppers" effort is having laudable effect. Experience
in the program shows that a good deal of the information developed
comes from co-conspirators or co-criminals who for their own
purposes or rewards turn to the law officers. The program
certainly does not depend on private trespassers. Part of
the funds given to support "Crimestoppers" comes from donations
from the public. That public support would soon evaporate
if indeed the result of the program was to turn our neighbors
into vigilantes riding into our yards, garages, vaults and
homes in search of tangible evidence of illegal activity. If,
as the State argues "Crimestoppers" depends upon invasion by
private trespassers for its ultimate success (I do not believe
so), then the program must face the same problem facing the
unlawfully-acting constable: as the case develops the quarry
may slip away. There are more ways than one to bag a cat.
Why use a bag with a large hole at the other end?

The State concedes that if the evidence in this case had
been produced by the same kinds of actions of police officers,
no appellate court including the United States Supreme Court
would condone admitting such evidence against the accused.

The State was not asked, but it would also have to concede, that if the record here showed the police officers had colluded with the private trespassers to produce the evidence it would not be admissible. So this case really comes down to this: the State is asking us to reinstate for State purposes the "silver platter" arrangement condemned in Elkins v. United States (1960), 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669.

Another argument raised by the State is that a criminal trial is a "search for truth" and therefore courts should accept all evidence, notwithstanding taint, except for the weightiest policy considerations requiring exclusion. It is not new that assertions of high moral purpose have been posted as reasons for abusing persons or rights. Robin Hood stole from the rich to gave to the poor--but he, the original Hood, was stealing. Brutus was concerned that Julius Caesar might make himself a king--and so he stabbed his friend. Adolph Hitler convinced a race that their superior blood should be kept pure--and they joined in the Holocaust. These are extreme examples but they serve. The end does not always justify the means.

Another argument made by the State is that the police in in this case are guilty of no wrongdoing. It was the private trespassers that acted illegally. Again the argument is not new. Adam tried to blame Eve when he was caught with the fruits of an illegal seizure. By accepting the fruits of the illegality the police have stripped themselves from any insulation from its illegality under our view of the law that they stand in the footpads of the trespassers.

Finally, a word about the posture of this case on appeal. The defendant comes to us as an appellant, despite the earlier rulings of this Court clearly on his side. In other words,

the prosecution and the District Court had chosen not to follow our clear direction on the state of the law in Montana on this matter. This may not be the case, but one day soon, it can be predicted, an innocent person will be falsely accused by a trespasser and the State will prosecute, and the county and state will be open to possible liability for wrongful prosecution. Sometimes it is smarter to follow the law even if one disagrees with it.

_____
John C. Sheehy
                    Justice

-14-

Mr. Justice Frank B. Morrison, Jr., specially concurring:

I concur in the result but dissent from the rationale.

The majority opinion states:

> "It is also undisputed in the case at bar that the defendant's right to privacy was violated."

I disagree.

The Montana Constitution provides:

> "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." 1972 Montana Constitution, Article II, Section 10.

In a series of cases referred to in the majority opinion this Court has held that the privacy provision of the Montana Constitution proscribes private action as well as government action. Such an interpretation finds support in the position articulated by one delegate at the Montana Constitutional Convention but, in my opinion, is not supported in the language of the privacy section itself.

Historically constitutions have been documents securing to private citizens certain fundamental rights against governmental intrusion. Constitutions should not regulate the conduct among the various private interests in our society. Such interests should be competed for in the political forum.

Constitutional rights, which protect against the awesome power of the State, are embedded in granite tablet. Once declared, these fundamental rights remain secure unless successfully attacked by a cumbersome constitutional amendment process. This process of amendment has never produced a restriction of rights. Once initially constitutionally rooted these fundamental declarations have become permanent.

In my view, the rights and obligations among our people should be fought for at the ballot box, lobbied for in the

legislative process, and clarified through litigation arising and culminating in the judicial branch. Competing concerns of private individuals are not entitled to constitutional permanency, but should be continually grappled with in a political forum where majority rule decides.

The 1972 Montana Constitution expressly proscribes private action in the human rights provision. 1972 Montana Constitution, Article II, Section 4. The delegates chose not to refer to private action in the privacy section. The courts should be reluctant to extend constitutional provisions beyond their stated purpose when the effect of such extension runs contrary to historical precedent and limits constitutionally the free action of private individuals.

The interpretation indulged by the majority results in greater restriction for the individual than for the State. Government action invading privacy can be justified where a compelling state interest is shown. If the privacy intrusion is committed by an individual, seldom, if ever, could a compelling state interest be demonstrated. The result would be to allow the State more freedom of movement than would be allowed any private citizen. I cannot believe this accords with constitutional intent.

The right to be free from undue meddling by anyone should properly be the subject of legislative action. Such privacy matters have been treated legislatively, i.e., credit reports are covered in Title 31, Chapter 3, MCA. Likewise, statutes protect against disclosure of a host of subjects including medical records, insurance information, accident reports, and information given to privileged sources. This writer feels that in this day of computerization and electronic eavesdropping more legislative attention should

be directed toward protecting individual citizens from uninvited outside intrusion. The public policy questions inherent in such legislative action should be debated and resolved by the political structure. The constitution inhibits government, not private citizens.

The strongest support for the majority decision involves application of the exclusionary rule on the basis of the "silver platter doctrine." As the majority notes, this doctrine prohibited the federal government from using evidence obtained illegally by state officers. At the time of the decision articulating the "silver platter doctrine" the Fourth Amendment to the United States Constitution did not apply to state officers and therefore, there was not a constitutional basis for excluding evidence which these officers obtained through illegal means. The evidence was handed by state officers to federal officers on a "silver platter." No illegal act was committed by federal officials in gathering the evidence. The exclusionary rule was applied by the United States Supreme Court though there could be no constitutional invasion by the state officers. The United States Supreme Court held that the evidence would be excluded because the federal prosecution, in using evidence illegally obtained by the State, became a lawbreaker and bred contempt for the law itself. As pointed out in the majority opinion, the United States Supreme Court in Elkins said in part:

> "If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means--to declare that the government may commit crimes in order to secure the conviction of a private criminal-would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face." (Citations omitted.) 364 U.S. at 223, 80 S.Ct. at 1447, 4 L.Ed.2d at 1681.

In Coburn, also cited by majority, Justice Daly very

-17-

logically noted:

> ". . .[U]nreasonable or illegal intrusions
> knowingly accepted and used, from the pri-
> vate sector by the government amount to an
> extension of the silver platter doctrine
> condemned by Elkins, particularly when
> viewed in the light of judicial integrity
> emphasized in Elkins." (Emphasis in origin-
> al) 163 Mont. at 503, 530 P.2d at 450.

If the "silver platter doctrine" is to be recognized for the purpose of excluding evidence obtained by private individuals then, in my opinion, it should be confined to instances where the evidence was obtained in violation of criminal statutes thereby rendering the evidence "illegal." In this way judicial integrity is preserved by not judicially blessing the fruits of illegal activity. Such an application of the exclusionary rule would not be premised upon an invasion of the accused's constitutional rights. Rather, the exclusionary rule, as a rule of court procedure, would prevent the State from relying upon the illegal conduct of a private citizen.

My position is thus being modified from that articulated in State v. Hyem (1981), ____ Mont. ____, 630 P.2d 202, 38 St.Rep. 891 (J. Morrison, dissenting). In my judgment, only the State can violate the constitutional right of privacy of an individual. Nevertheless, if a private individual violates the penal statutes of this State and thus obtains evidence subsequently offered against an accused, the exclusionary rule should be applied to deny such tainted evidence admission. Therefore, I would vote to grant suppression of the evidence obtained in this case.

I concur with the majority in remanding.

_____
Justice

I concur in the opinion of Justice Morrison.

_____
Justice

-18-

Mr. Justice John Conway Harrison dissenting:

This Court in a series of opinions commencing with State v. ~~Brook~~ Brecht, supra, 1971, and ending with our latest case of State v. Hyem, supra, 1981, has established that the exclusionary rule is applicable to both public and private citizens. However, as Justice Morrison, so ably noted in his dissent in Hyem, (supra), Montana is the one state in fifty that has extended the exclusionary rule to private actions. This has, in my opinion, caused considerable problems within the criminal law field and while I have disagreed with the views of the majority from their inception, my one and only reason for speaking out again is in expectation that a middle-ground approach can be made by this Court in some future case that will not be quite as extensive as our present rule.

I would hold that evidence should not be suppressed under the exclusionary rule where it is discovered by officers or private persons in a course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they are authorized. By recognizing that the present exclusionary rule exists to deter willful and flagrant actions by police, not unreasonable, good faith ones, perhaps an amicable solution to this problem in the law can be worked out. Examining not only our cases but cases outside this jurisdiction, I am of the opinion that costs to society of applying the present rule is beyond the purposes for which it exists and are simply too high a price to pay.

_____
Justice

Mr. Justice Gene B. Daly, who was unable to attend the oral argument, did not participate in this decision.