No. 80-364

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

STATE OF MONTANA,

Plaintiff and Appellant,

vs.

DALE HYEM and CYNTHIA EFFINGER,

Defendants and Respondents.

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Carbon.
Honorable William J. Speare, Judge presiding.

Counsel of Record:

For Appellant:

Hon. Mike Greely, Attorney General, Helena, Montana
Sheri Sprigg argued, Assistant Attorney General, Helena,
Montana
Pablo Perhacs, County Attorney, argued, Red Lodge, Montana

For Respondents:

Overfelt Law Firm, Billings, Montana
Gary Overfelt argued, Billings, Montana
Stacey & Jarussi, Billings, Montana
Gene Jarussi argued, Billings, Montana

Submitted: March 26, 1981

Decided: June 4, 1981

Filed: JUN 4 1981

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

The State of Montana appeals from an order of the District Court, Thirteenth Judicial District, Carbon County, granting defendants' motion to suppress all evidence resulting from an unreasonable search and seizure.

On February 25, 1980, defendants were charged with alternative counts of felony theft--either having stolen a pair of Rossignol SM Equipe skis on January 12, 1980, or having possessed them on February 21, 1980, knowing that they were stolen. The charges arose when skis, belonging to Buzz Welch, were found in defendants' residence and seized by officers of the Carbon County sheriff's office pursuant to a search warrant issued by the local justice of the peace. The issuance of the warrant was based on affidavits of Welch, who said his skis had been stolen, and of Kurt Hallock and Jack Marcure, who stated they had seen the skis at defendants' rented home in Red Lodge, Montana. The circumstances surrounding the latter affiants' discovery must be closely scrutinized in this appeal.

The defendants and affiants were all employed in various capacities at Red Lodge Ski area. During the 1980 ski season, a rash of ski thefts were reported, including two thefts reported by Welch and Marcure. The skis reported stolen by Welch and Marcure were identical except in length, binding type and serial number. After discussing the missing skis with numerous acquaintances, Hallock formed the opinion that the skis were in the possession of the defendants at their rented home.

The defendants were tenants in a residence owned by Mr. Prather. The residence was listed for sale through the

Marshall Real Estate Agency. The real estate agent in charge of selling the house was Barbara Marshall. Defendant Hyem was aware that she had keys to the house and had shown it to prospective purchasers in his absence.

In the off-season, Hallock and Marcure purchase and remodel old houses and had previously done business with Marshall. Aware that the house was on the market, they contacted Marshall and asked to be shown the house. Hallock testified that he wanted to tour the house both for business reasons and to search for the skis, while Marcure's sole purpose was to search for the stolen Rossignols.

At the hearing, only Hallock and Marshall were called as witnesses. Hallock testified that during inspection of the premises, Marcure dropped his sunglasses beside a bed, and then saw the skis thereunder. Marcure removed the skis halfway from under the bed and found that the serial number matched that of Welch's missing skis. Hallock stated that only by pulling the skis out from under the bed could the serial number and positive identification be ascertained. Hallock further testified that until Marcure pulled the skis out, he was unable to see any part of the skis.

Marshall testified that upon entering the house she admonished Hallock and Marcure not to touch any personal property contained therein. She further testified that her observation of the bedroom area disclosed that only the tips of the skis were visible beneath the bed.

After completing a tour of the house, Hallock and Marcure reported their discovery to the Carbon County attorney's office, which in turn applied for and received a search warrant.

On motion of defendants, the District Court agreed that the evidence had been obtained by an unreasonable search, and ordered the evidence suppressed. It is from that order that the State appeals.

The issues to be considered on appeal are: (1) Whether the citizen search violated the defendants' right of privacy; and, (2) Whether defendants consented to the search and thereby waived their right of privacy.

Montana's constitution must be read as a whole and its separate sections interpreted in relation to one another. Unlike the federal constitution, our constitution particularly provides for an individual's right of privacy in 1972 Mont. Const., Art. II, § 10, which states: "The right of individual privacy is essential to the well being of a free society and shall not be infringed without the showing of a compelling state interest."

Application of this right is as diverse as the components which make up a free ordered society. Inasmuch as a citizen's personality and thoughts are protected as private, so are a citizen's physical solitude and right to be let alone. Moreover, 1972 Mont. Const., Art. II, § 11, which mirrors the Fourth Amendment to the United States Constitution, states that:

> "The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing." (Emphasis added.)

A warrantless search is per se unreasonable, unless it falls within one of the defined exceptions to the warrant requirement. Coolidge v. New Hampshire (1971), 403 U.S.

-4-

443, 91 S.Ct. 2022, 29 L.Ed.2d 564. Before the warrantless search, neither Hallock nor Marcure could have obtained a valid search warrant because they were not possessed of their own knowledge, or through demonstrably reliable informants, of facts sufficient to establish probable cause, an essential ground for the issuance of a warrant. Section 46-5-202(1)(b), MCA. This warrantless search does not fall within any of the exceptions to a warrant requirement, which exceptions arise out of exigent circumstances necessary to protect or preserve life or to avoid serious injury (see, Wayne v. U.S. (D.C.Cir. 1963), 318 F.2d 205), or arise from the evanescent nature of the material seized. Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; Schmerber v. California (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.

Since the warrantless search here was per se unreasonable, it was unconstitutional under our federal and state constitutions, and therefore unlawful. It violated the Fourth Amendment of the United States Constitution, and also 1972 Mont. Const., Art. II, § 11.

In addition, the warrantless search violated the defendants' rights of privacy under the 1972 Mont. Const., Art. II, § 10, which we have quoted previously. Here, rights of individual privacy were infringed without the showing of a compelling state interest. Since Hallock and Marcure were acting in their individual capacities, and not for the state, state action was not involved, and the searchers could never be in a position of showing a compelling state interest. Under the 1972 Montana Constitution, the only exception to the restriction against the invasion of individual privacy is a compelling state interest. The private parties here, acting on their own hook, could not establish a compelling state interest.

-5-

The right of individual privacy, the right to be secure in one's home, was prized in Montana even before the adoption of the 1972 Montana Constitution. In Welsh v. Roehm (1952), 125 Mont. 517, 241 P.2d 816, it was held valuable enough to support a verdict of punitive damages without general damages against the invaders of a tenants' possessory rights. In State v. Brecht (1971), 157 Mont. 264, 485 P.2d 47, this Court applied the exclusionary rule to a telephone conversation of the defendant, overheard by an interloper on an extension line. In that case, this Court found that the right of individual privacy was adequately expressed, though penumbrally, in 1889 Mont. Const., Art. 3, § 7, which read as follows:

"Section 7. The people shall be secure in their persons, papers, homes, and effects, from unreasonable searches and seizures and no warrant to search any place or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, nor without probable cause, supported by oath or affirmation, reduced to writing."

In Brecht, it was pointed out that there cannot be a fictional difference between classes of citizens: those who are commanded to obey the constitution and those who are not. Our constitutional prohibition against unreasonable invasion of privacy applies to all persons, whether acting for the state or privately.

The policy to set a special store on the right of privacy was expressly enunciated in the 1972 Mont. Const., Art. II, § 10, and the implementation of that policy was continued by this Court, in State v. Helfrich (1979), ___ Mont. ___, 600 P.2d 816, 36 St.Rep. 1763. There we upheld the suppression of evidence gathered by a private citizen who entered a fenced garden to obtain a sample of growing marijuana, which the citizen turned over to the authorities. There was no showing in Helfrich, as there is no showing at

-6-

the case at bar, that the private citizen was acting in concert with the police authorities. Nevertheless, we held the suppression of such evidence proper. Here, we have nearly the same situation, except that Hallock and Marcure gained entry to the defendants' rented premises on an ostensibly legitimate excuse, to view the real property as prospective purchasers. We cannot see that a citizen gaining entrance to otherwise private property by a ruse is in any better position to obtain incriminating evidence against a lawful possessor (as distinguished from a guest or licensee) of that property than one gaining entrance by trespass. The result in each case is the same--invasion of the possessor's private property. Under Helfrich, therefore, the evidence resulting from the unreasonable search of the premises by private citizens is illegally obtained, and must be suppressed. When private citizens, acting on their own initiative, unreasonably invade the privacy rights of individuals, the evidence thus obtained against the other individuals is subject to the exclusionary rule. This is the teaching of Helfrich, supra.

The State argues that evidence obtained by a private citizen should be suppressed only if it was obtained in an "illegal manner." We understand the essence of that argument. The State means that the evidence should be suppressed only if the evidence was obtained in violation of statutory law. The argument, however, overlooks that searches and seizures which, though they may not violate statutory law, may nevertheless be unreasonable in the constitutional sense, and therefore, unlawful. In State v. Coburn (1974), 165 Mont. 488, 530 P.2d 442, we stated that the ever-increasing presence of private police, coupled with a citizen's ability to arrest, mandated that the private sector be subject to the

same constitutional scrutiny as the public sector. Thus, the actions of Hallock and Marcure in the present case must be measured against a standard of reasonableness to determine if they violated defendants' right of privacy. This brings us back to what we said at the outset of this discussion, that a warrantless search is unreasonable per se unless the search falls within one of the defined exceptions. The search being unreasonable, and the rights of privacy having been invaded thereby, the unconstitutional invasion of the defendants' rights of privacy was an unlawful act.

Thus it is that on two counts, a violation of the state and federal constitutions on searches and seizures and a further violation of the state constitutional right of privacy, the evidence produced herein is subject to the application of the exclusionary rule.

The exclusionary rule has been the subject of considerable legislative and editorial discussion in recent months. Perhaps not well-known is the fact that the United States Supreme Court first announced that rule 67 years ago in Weeks v. United States (1914), 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, where the use of evidence obtained in violation of the Fourth Amendment was barred in federal prosecutions. After Silverthorne Lumber Company v. United States (1920), 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, the rule came to be known as the "fruit of the poisonous tree" doctrine. In 1961, the United States Supreme Court, in Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, made the exclusionary rule fully applicable to the states under the Fourteenth Amendment. The "poisoned fruit" rule was recognized by this Court in dictum in State v. Yoss (1965), 146 Mont. 508, 409 P.2d 439.

-8-

The exclusionary rule grew out of the writings of some of the most esteemed men ever to occupy seats on the United States Supreme Court, including Justice Oliver Wendell Holmes, and Justice Louis Brandeis. They became aghast at the long train of cases where federal agents had ignored constitutional protections in obtaining evidence, and had been willing to perjure themselves as if they had not so acted. Holmes said:

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source, they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed." Silverthorne, supra, 251 U.S. at 392.

Justice Brandeis said:

> ". . . If the government becomes a lawbreaker it breeds contempt for law . . ." Olmstead v. U.S. (1928), 277 U.S. 438, 483-485.

At first the exclusionary rule applied only in the federal courts, in federal prosecutions. It was not applied in the states. This duality of application resulted in anomalies. For example, in State v. District Court, et al. (1928), 82 Mont. 515, 268 P.2d 501, the Montana court held that the provisions of the federal constitution against unreasonable searches and seizures had no application to state officers. In that case, federal officers had violated the constitutional rights of a person by opening a package sent through the mail containing the drug morphine. The sheriff arrested the addressee and seized the package on information imparted to him by the federal officers as to its contents. The sheriff was not acting in cooperation or collusion with the federal officers. This Court held that the seizure in that mode did

-9-

not render the package inadmissible in evidence, under the state constitution, and held that the District Court, in suppressing the evidence, committed error.

Thus, the prosecution was able to use evidence in a state court prosecution that would have been barred in a federal prosecution at that time.

If the result in the 1928 Montana case now seems incongruous, be assured that Montana was not alone in its incongruity. In Irvine v. California (1954), 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561, a case involving police misconduct so outrageous so as to be "almost incredible if it were not admitted," the Supreme Court did not impose the exclusionary rule on the state, even though the misconduct was extreme. Irvine, supra. Until the time of Mapp, supra, more than twenty states were still admitting illegally-seized evidence.

California, it should be noted, was one of the states that adopted the exclusionary rule before the holding in Mapp. It changed its judicial mind between the time, in 1942, when it held that illegally-seized evidence was admissible (People v. Gonzalez (1942), 20 Cal.2d 165, 124 P.2d 44) and the case adopting the exclusionary rule in 1955 (People v. Cahan (1955), 44 Cal.2d 434, 282 P.2d 905). The California court could no longer stomach the situation where "law enforcement officers . . . casually regarded [illegal searches and seizures] as nothing more than the performance of their ordinary duties . . ." 282 P.2d at 907. Its Chief Justice, Roger Traynor, later wrote in 1962:

> "My misgivings about . . . [the admissibility of illegally-seized evidence] grew as I observed that time after time it was being offered and admitted as a routine procedure . . . It was one thing to condone an occasional constable's blunder, to accept his illegally obtained evidence so that the guilty would not go free. It was

quite another to condone a steady course of illegal police procedures that deliberately and flagrantly violated the constitution of the United States as well as the state constitution.

"Ah, but surely the guilty should still not go free? However grave the question, it seemed improperly directed at the exclusionary rule. The hard answer is in the United States Constitution as well as in state constitutions. They make it clear that the guilty would go free if the evidence necessary to convict could only have been obtained illegally, just as they would go free if such evidence were lacking because the police had observed the constitutional restraints upon them. It is seriously misleading, however, to suggest that wholesale release of the guilty is a consequence of the exclusionary rule. It is a large assumption that the police have invariably exhausted the possibilities of obtaining evidence legally when they have relied upon illegally obtained evidence. It is more rational to assume the opposite when the offer of illegally-obtained evidence becomes routine." Traynor, Mapp v. Ohio At Large in the Fifty States (1962), Duke L.J. 319, 321, 322. (Emphasis added.)

The exclusionary rule is not a judicial plaything, casually adopted and casually waived. It is a constitutional answer to unconstitutional activity. It is an affirmation that a free government can no more tolerate the unlawful activities of its agents than crime in the streets. It is paste and cover for the bones of our individual constitutional rights, without which such rights were in danger of becoming an unfleshed skeleton.

Sometimes, it is to be admitted with the deepest regret, the result of the exclusionary rule is that the guilty criminal goes free. That is the price of liberty. It is irrefutable that many times criminals go free because officers are careful to act constitutionally. There is no judicial logic in contending that they should not go free when officers act unconstitutionally.

An important distinction must be made in this case, however, because here the unreasonable search was made not by police officers but by private individuals. The State

-11-

has pointed out to us that Mapp v. Ohio, supra, extended the operation of the Fourteenth Amendment, and the application of the exclusionary rule to state cases, but only when state action is involved. This is necessarily true because of the provisions of the Fourteenth Amendment, which apply only to states and not to individuals. As we have pointed out above, however, Montana applies the exclusionary rule to actions by individuals where the state constitution has been violated. Brecht, supra; Helfrich, supra. The wisdom of that course should be obvious: the Montana law applies equally to agents of the state and to private individuals. We have no duality of rights, one set of laws operating when state action is involved, and another set of laws applying when private action is involved; we avoid such anomalies as may occur when private individuals act for, but not in concert or collusion with police officers. We have not adopted a course of legal schizophrenia. An across-the-board application of the exclusionary rule results in a clear equality of result, and does not depend upon fortuitous circumstances which might excuse in one situation a violation of constitutional rights, and discountenance such violations in another situation.

The second part of the issues to be considered here is whether the defendants here consented to the search which was made and thereby waived their right of privacy. This involves the determination and application of standards for the invasion of privacy.

Privacy has been defined as the ability to control access to information about oneself. Fried, Privacy (1968), 77 Yale L.J. 475, 482, 483. In Katz v. U.S. (1924), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, the Supreme Court determined

-12-

under the federal constitution that privacy is protected if the defendant has an actual subjective expectation of privacy and that expectation is objectively reasonable. Therefore, what is sought to be preserved as private, even in an area accessible to the public, may be constitutionally protected. See, Rios v. United States (1960), 364 U.S. 253, 30 S.Ct. 1431, 4 L.Ed.2d 1688.

The defendants were aware that their rented house was for sale and being shown to prospective buyers in their absence. The defendants, therefore, could not have a reasonable expectation of privacy in the areas of the house which are normally subject to inspection by prospective purchasers. The skis, however, were personal property, not for sale, and not items which are normally the subject of inspection by house buyers. Even though the bedroom was accessible to the public, by placing the skis under the bed, out of the public's view, defendants sought to preserve the skis as private and, thus, be afforded constitutional protection. We find that such an expectation of privacy is reasonable.

The search was conducted by private citizens not acting in concert with any law enforcement agency, thus precluding the assertion of a compelling state interest. 1972 Mont. Const., Art. II, § 10. It is undisputed that Marcure's sole purpose of inspecting the house was to search for the skis. The premises were open to inspection by prospective purchasers, not persons attempting to dispel or substantiate rumors. From the outset, Marcure was improperly on the premises in an unreasonable invasion of defendants' expectation of privacy. Moreover, by removing the personal property from underneath the bed and inspecting it, both Hallock and Marcure went beyond their legitimate purpose for being on

-13-

the premises against the admonition of the real estate agent, and they thereby violated defendants' right of privacy.

The skis were seized by police pursuant to a search warrant which was issued based on the affiants' discovery of the skis. The only way Hallock and Marcure could positively identify the skis was by removing them from under the bed and checking the serial numbers. This action was an unconstitutional violation of defendants' right of privacy. In the absence of a positive identification of the skis, it is unlikely that Hallock's mere suspicion would justify the issuance of a search warrant. Therefore, the evidence was properly suppressed as fruit of an unreasonable search and seizure.

The State takes the position that by consenting to allow the house to be shown to prospective purchasers, defendants waived their right of privacy. In Johnson v. Zerbst (1938), 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, waiver is defined as "an intentional relinquishment or abandonment of a known right or privilege." Thus, if a consent search is a matter of waiver, then the consent would be effective only upon a showing that the individual who purportedly consented, agreed to the search that occurred. Here the defendants did not consent to a search and seizure of the personal property in their possession.

Accordingly, we affirm the judgment of the District Court in suppressing the evidence.

_____John C. Sheehy_____
                Justice

-14-

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent from the majority opinion.

The facts of this case do not form the basis for this dissent. Rather the purpose is to reexamine State v. Brecht (1971), 157 Mont. 264, 485 P.2d 47; State v. Helfrich (1979), ___Mont.___, 600 P.2d 816, 36 St.Rep. 1763, and the rationale expressed by the majority in the case at bar.

In Brecht and Helfrich this Court held that the Montana constitution's sections on privacy and unreasonable search and seizure address private action as well as state action. The court further held that the exclusionary rule is automatically applied if a constitutional right is invaded. These two holdings are followed in the instant case.

A careful reading of these three decisions discloses a lack of rationale supporting a radical departure from precedent established by every other appellate court. Montana is the only jurisdiction to my knowledge which has extended either "search and seizure" or "privacy" provisions to private action. Additionally we are the only court which has applied the exclusionary rule to private action.

In my opinion there are two issues which should be addressed in this case: (1) Does Article 2, §10, of the Montana Constitution providing for the right of privacy, or Article 2, §11, of the Montana Constitution providing for the security from unreasonable search and seizure, apply to individual action as opposed to state action? (2) Should the exclusionary rule be applied to suppress evidence obtained by an individual where that individual does not act in concert with agents of the state? I would hold that the constitutional provisions referred to herein, contemplate state action only. I would further hold that the exclusionary

-16-

rule does not apply to private action.

Montana is one of only ten states to have an express provision for privacy in the state constitution. As mentioned previously, none of these states have held the privacy protections to be applicable to acts of private persons. Arizona has directly held that the privacy prohibition applies only to state action. Cluff v. Farmers Insurance Exchange (1969), 10 Ariz.App. 560, 460 P.2d 666, 669. Alaska has limited its application to state activities. See e.g., Allred v. State (1976), 554 P.2d 411, 416; Falcon v. Alaska Public Offices Com'n (1977), 570 P.2d 469, 476.

Montana first extended privacy rights to private action in State v. Brecht, supra. In that case a man telephoned his wife and threatened to shoot her. Another person, listening in on an extension, overheard the conversation. When the wife was shot and killed a short time later, the District Court allowed the eavesdropper to testify regarding what she overheard. This Court reversed holding that Brecht's right of privacy was protected from an invasion from a private individual. The court cited Katz v. United States (1967), 389 U.S. 347 / 88 S.Ct. 507, 19 L.Ed.2d 576, as support for its holding. However, Katz involves government action, not private action and provides no support for this Court's position in Brecht.

In State v. Helfrich, supra, the court followed the holding of Brecht, but expanded the discussion. The court relied upon transcripts from the constitutional convention in concluding that the framers of the constitution intended for the right of privacy to protect persons against both private and government action. The court cited the following transcript quotations:

> ". . . Certainly, back in 1776, 1789, when they developed our Bill of Rights, the search and seizure

-17-

provisions were enough, when a man's home was his
castle and the state could not intrude upon his
home without the procuring of a search warrant
with probable cause being stated before a magis-
trate and a search warrant being issued. No other
protection was necessary and this certainly was
the greatest amount of protection that any free
society has given its individuals. In that type
of a society, of course, the neighbor was maybe
three or four miles away. There was no real
infringement upon the individual and his right of
privacy. However, today we have observed an
increasingly complex society and we know our area
of privacy has decreased, decreased, and decreased
. . . Tr. of the Montana Constitutional Convention,
Vol. VII, pp. 5180-81.

"'. . . It isn't only a careless government that has
this power to pry, political organizations, pri-
vate information gathering firms, and even an
individual can now snoop more easily and more ef-
fectively than ever before . . .' Tr. at pp. 5182."
Helfrich, _____ P.2d ___, 37 St.Rep. 1766.

The second quotation actually resulted from a delegate

reading from a newspaper editorial which supported an

expanded right of privacy. However, the balance of the

delegate's statement is very significant. It reads:

"It produces what I would call a semi permeable
wall of separation between individuals and state;
just as the wall of separation between church and
state is absolute, the wall of separation we are
proposing with this section would be semi perme-
able. That is, as a participating member of society
we all recognize that the state must come into our
private lives at some point, but what it says is
don't come into our private lives unless you have a
good reason for being there. We feel that this,
as a mandate to our government, would cause a
complete reexamination and guarantee our indivi-
dual citizens of Montana this very important right."
(Emphasis supplied.) Tr. at pp. 5181.

In my opinion, the majority can find little solace from

reading the Constitutional Convention Transcript. When

talking about the privacy section, state action rather than

private action, is emphasized. Furthermore, the privacy

section, Article 2, §10, specifically states: "The right of

individual privacy is essential to the well being of a free

society and shall not be infringed without the showing of a

compelling state interest." (Emphasis supplied.) The

-18-

language of the section itself indicates that the framers contemplated state action by allowing an invasion where there was a compelling state interest.

Historically constitutions have always been a means for people to address their government. In rare instances the constitutional framework has embraced sections specifically speaking to private persons. Article II, §4, of the Montana Constitution provides in part: ". . . Neither the state nor any person, firm, corporation, or institution shall discriminate against any person . . ." (Emphasis supplied.) Notably the privacy section does not address private individuals.

By interpreting Montana's constitutional right of privacy as a prohibition against private, as well as state action, this Court has set itself foursquare against the position of the courts of all other states, and in my opinion, against the intention of the framers of Montana's constitution.

The second issue which must be addressed is application of the exclusionary rule. It is apparent to me that the majority has elevated the exclusionary rule to constitutional status. This conclusion seems inescapable in the light of its automatic application in Brecht, Helfrich, and this case. As the majority here states: "It is paste and cover for the bones of our constitutional rights . . ." Nevertheless there seems to be confusion on this point as the legislature continues to pass legislation, though vetoed, abolishing the exclusionary rule and providing a "deterrent" alternative. Under the current posture of Montana constitutional law such legislation is patently unconstitutional.

The exclusionary rule was first enunciated in Weeks v. United States (1914), 232 U.S. 383, /34 S.Ct. 341, 58 L.Ed 652. The rule was evidentiary in nature and not deemed to be rooted in the constitution itself.

-19-

In Burdeau v. McDowell (1921), 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, the Supreme Court of the United States limited application of the exclusionary rule to acts of the sovereign. Therefore, evidence procured by a private person was not subject to exclusion even if obtained in an unreasonable search.

Justification for the exclusionary rule arises from a desire to deter unlawful police action. The rule has only minimal deterrent value when applied to private persons. If the rule is to have a deterrent effect, potential violators must be aware of the rule. It is doubtful that private individuals in our society understand and appreciate the exclusionary rule, and there is little evidence that application of the exclusionary rule to private violators would reduce the number of violations.

Automatic application of the exclusionary rule certainly cannot be justified on the basis of repairing a constitutional harm. The effect of applying the rule offers no reparation in the case of an unreasonable search and seizure yielding no criminal evidence. The rule's remedy is limited to those who have committed a crime, thereby denying reparation to all others.

The exclusionary rule is a valuable tool in deterring unreasonable police action. In private action cases the purpose wanes.

I would hold, in this case, the skis which were seized, were the fruit of private action and therefore not subject to suppression. I would reverse the District Court and remand this case for trial.

Justice

-20-

We concur with the foregoing dissent:

_____

_____
John Conway Harrison
Justices

Mr. Justice Gene B. Daly specially concurring:

I concur with the majority opinion. I, however, find it necessary to comment on the overzealous statements contained in the dissenting opinion as they go to the roots of constitutional history.

First the allegation is made that in the Brecht case, supra, this Court used the case of Katz v. United States (1924), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, a landmark federal decision, to support the holding in Brecht. This is not true, especially in that context.

A study of the constitutional history of the Fourth Amendment will reveal that when Chief Justice Taft was head of the federal judicial system he was adamant in his belief that the Fourth Amendment was cast in nonflexible concrete.

Taft argued with Brandeis and Holmes that a telephone tap intrusion by the sovereign did not come within the protection of the Fourth Amendment because a physical intrusion or trespass into the protected enclave was required to trigger the protection of the Fourth Amendment. He explained additionally that a further test was obvious in that the telephone did not exist at the time the Fourth Amendment was written and, therefore, it was not possible to have a telephone intrusion within the contemplation of the framers of the Amendment. Brandeis and Holmes, of course, argued for flexibility.

The storm continued for many years, and, finally, the case of Katz v. United States, supra, reversed the rule in Olmstead v. United States (1928), 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (authored by Chief Justice Taft). Katz held, in essence, that the enclave position was no longer completely valid because the protection of the Fourth Amendment was a personal right and followed the person. A

-22-

trespass was not a necessary element, i.e., meaning that the Fourth Amendment was not static, but rather a living, flexible, breathing part of a constitution that is subject to interpretations that will accommodate modern day technology and, hence, a document that has not worn thin with the passing of time.

This is the rationale of Katz, and properly applied in a constitutional context, minus emotional involvement, it is very meaningful to this historic problem and has a rational connection.

The problem is well explained in a case not cited by the dissent, State v. Coburn (1974), 165 Mont. 488, 530 P.2d 444, and I quote therefrom:

> "'The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued.' [Burdeau v. McDowell (1921), 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048.] (Emphasis added.)

> "A fair analysis of the arguments would seem to imply that the position of the parties was much the same as that expressed by Chief Justice Taft, writing for the majority in a five-four decision, Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 954 (1928), a telephone intrusion case by federal officers, where he held the Fourth Amendment not subject to application beyond the intent of the framers of the amendment and its words could not be stretched to be given a meaning to include 'intangible' and trespass was a requirement to invade the protected property.

> "All parties in the instant case have avoided any analysis of Katz in which, Justice Black in his dissenting opinion proclaims that the majority in Katz have 'rewritten the Fourth Amendment'. Justice Black in his dissent

-23-

also relied heavily on Olmstead.

"It would appear then that the arguments based on strict interpretation, origin, history, and intent of the authors as they concern the Fourth Amendment are highly diluted since Katz in 1967. The majority in Katz recognize that the former decisions of the Court foreclosed Fourth Amendment inquiry when penetration or trespass was absent, citing Olmstead and Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, for the Amendment was thought to limit only searches and seizures of tangible property and property rights controlled. The majority, in Katz, cited Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734, as the departure from that narrow view and included intangibles as well. It went on to hold that the Fourth Amendment protects people and not simply 'areas' and therefore the reach of the Fourth Amendment cannot turn upon the presence or absence of physical intrusion into any given enclosure, and the trespass doctrine in Olmstead and Goldman can no longer be controlling.

"This then demonstrates a radical departure from the accepted meaning of the words of the Fourth Amendment which controlled for over a period of 40 or more years, since Olmstead. It further demonstrates that these traditional concepts are not static. This is not a new concept by any means. In Olmstead, many years ago, among the four dissenting justices, Brandeis observed in reference to interpretation on the same subject as Katz:

"'Clauses guaranteeing to the individual protection against specific abuses of power, must have a similar capacity of adaptation to a changing world. It was with reference to such a clause that this court said in Weems v. United States, 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed. 793, 801: "Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of Constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, 'designed to approach immortality as nearly as human institutions can approach it.' The future is their care and provision for event of good and bad tendencies of which no prophecy can be made.

-24-

In the application of a Constitution, therefore, our contemplation cannot be only of what has been but of what may be. Under any other rule a Constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas. Rights declared in words might be lost in reality."' (Emphasis added.)

"So far as privacy is concerned, <u>Katz</u> recognized the Fourth Amendment was not a general right of privacy but the right was contained in the Fourth and several other amendments, the First, Third and the Fifth, and as stated in <u>Katz</u> at p. 350 of 389 U.S., at p. 511 of 88 S.Ct., at p. 581 of 19 L.Ed.2d in reference to the right of privacy: '* * * his right to be let alone by other people--is, like the protection of his property and of his very life, left largely to the law of the individual States.'

"In Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Court noted that the Fourth and Fifth Amendments were very closely tied and the unreasonable search and seizure of the Fourth Amendment almost always compels a man to give evidence against himself which is condemned in the Fifth Amendment. In this regard the Fourth and Fifth Amendments almost run into each other. This adds to the problem the fact that a violation of the <u>Fifth Amendment rights, whether private or government, is condemned in all courts, military and civil</u>. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958).

"Concerning the exclusionary rule itself, it would be well to consider first that the 'exclusionary rule' is a court adopted rule resting on the 'rule making' and 'supervisory power' of the Supreme Court over the other courts and has no roots in the constitution or the statutes of the state or federal government. (Dissent in <u>Katz</u> by Justice Black and citing Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782; Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933; Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, 1677, 1680, 1681 (1960)).

"The fact that the rule is characterized as not satisfactory and the state in argument recommended that a tort remedy for the aggrieved was adequate, simply ignores that all of the cases which declare the rule as a deterrent because the wrong cannot be

corrected or compensated, but merely avoided in the future, must have recognized that there could be no price placed on a constitutional right." State v. Coburn, 165 Mont. at 496-499.

Further, I would only say that the dissent, as it speaks to the right of privacy contained in the Constitution of the State of Montana, can only be characterized a personal feeling, as the comments are lacking any recognized supporting authority.

As the dissent speaks to the exclusionary rule, it accuses the Court of elevating the rule to a constitutional position. I think if time were taken to read State v. Coburn, supra, the confusion would disappear, and the Court's position would be apparent. It makes no difference in the constitutional history of the rule or its application to Montana law by the United States Supreme Court that the Montana Legislature continues to attempt to legislate in that area. It is their prerogative; and, as day follows night, it is this Court's duty to examine the legislative product for constitutional defect.

Gene B Daly