THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.*
ROBERT BRECHT, DEFENDANT AND APPELLANT.

No. 11787.
Submitted February 10, 1971.
Decided May 10, 1971.
Rehearing Denied June 7, 1971.
485 P.2d 47.

Howard Foreman (argued) Billings, for appellant.

Robert L. Woodahl, Atty. Gen., Helena, J. C. Weingartner, Asst. Atty. Gen., (argued) Helena, William Blenkner, County Atty., Columbus, for respondent.

MR. JUSTICE DALY delivered the Opinion of the Court.

On May 18, 1967, defendant Robert Brecht was charged by information in the District Court of the Thirteenth Judicial District, County of Stillwater, with murder in the first degree. The charge arose from the shooting death of defendant's wife, Mary Ann Brecht on May 17, 1967. Trial was had and the jury returned a verdict of murder in the second degree on February 24, 1968. The presiding judge sentenced the defendant to 30 years confinement in the Montana state prison on February 26, 1968.

Court appointed counsel at trial elected not to appeal for post conviction relief and present counsel was appointed by the district court to represent him. Hearing was had before the presiding judge on July 2, 1969. The matter was thereupon taken under advisement, but prior to decision the presiding judge died.

Upon proper application, this Court assumed jurisdiction and ordered transcripts furnished and briefs filed. 27 St.Rep. 379. Following preparation of the transcript of the trial and filing of briefs, the present cause was heard on oral arguments before this Court on February 10, 1971.

Defendant Robert Brecht, age 30, of Columbus, Montana and Mary Ann Brecht were married in November 1958. They had two children. At the time of trial the girl was 8 years old and the boy 7. Defendant had been a resident of Columbus since 1948 and graduated from high school there in 1955. He served in the military and earned his living in the construction trade.

At the time of the fatal shooting on May 17, 1967, the defendant and his wife had been separated for about six weeks. This had happened twice previously and reconciliation had followed both times. Mary Ann Brecht was employed as a bartender at the Ten Inn, located between Columbus and Park City, Montana. On the day of the shooting Mrs. Brecht was working the day

shift and normally would have been off shift by 6 or 6:30 p.m. but that day she had stayed late at the request of the owner. Defendant was released from his job early that day and he went to the Ten Inn in the late afternoon to discuss with his wife the matter of both contributing toward a birthday present for their son. The record discloses that defendant was in debt and without ready funds. He testified that he discussed with his wife the possibility that she ask her employer, Bill Revell, to loan him $20 on his shotgun. This gun had been "hocked" on a previous occasion to a Mr. Mulvehill and redeemed in late April 1967. Mulvehill had been upset because of the long time involved before the gun was redeemed and further because the gun had a faulty firing mechanism and malfunctioned, which prevented a sale. Another witness affirmed the malfunction of the gun.

Defendant testified that prior to the homicide he had prepared to hunt crows with the shotgun and had removed the "plug" from the gun's magazine. The "plug" was a device to reduce the shell capacity of the gun from 5 shells to 3 shells when hunting game birds, as required by law. Afterward by habit, defendant ejected only 3 shells and 2 remained in the gun without his remembrance.

Defendant returned to his home after the initial visit with his wife and before returning to the Ten Inn, at about 8 p.m., placed the shotgun in his car. Defendant testified that when he entered the bar Bill Revell, the bar owner; Mary Ann, defendant's wife; and a customer named John Strecher were there. Defendant's wife was behind the bar and the two men on stools in front of the bar. Defendant did not, at this time, bring the gun into the bar. He asked his wife if she had discussed the loan on the gun with Bill Revell and was informed that she had not. Defendant then told her he would get the gun and let Revell look it over. He went to his car, removed the gun, returned to the bar, and placed the shotgun on the top of the bar. Revell, upon seeing the gun, told him to "get that thing out of here." As defendant picked up the gun, the bar stool upon which he had his knee tipped forward and he let go of the gun with

his left hand to catch hold of something and the gun fired. Defendant further testified that he pumped the gun because another shell was hung up on the ejector and in so trying to unload it, the gun went off again, firing out the door. At that time he noticed his wife, Mary Ann, was hurt. He tried to aid her but she did not respond. All other persons had fled from the bar. Defendant then picked up the gun and left the bar to go home to Park City.

When defendant walked out the front of the building Bill Revell, the owner, was approaching and he spoke to him in regard to getting an ambulance. Defendant then drove down along the river, gained some control, and remembering the two extra shells, threw the gun into the river. He then returned past the Ten Inn on his way home. When he reached home he was taken into custody.

John Strecker, who was not acquainted with defendant, testified he was in the bar when Brecht entered. Strecker went to the men's room and when he returned defendant had a gun. He heard defendant say that this was a 12-gauge. The gun was pointed at Mary Ann Brecht. He testified that when he first observed defendant holding the gun, it was with both hands; that thereafter defendant removed one of his hands from the gun and was holding it with one hand; that while he was holding the gun with one hand the gun was tilted so that Strecker observed a shell in the magazine; and, that when the gun went off he, Strecker, bolted from the room.

Bill Revell testified that John Strecker called his attention to the gun, and that defendant was pointing the gun directly at Mary Ann while the gun lay diagonally on top of the bar with defendant's hands on the gun. Further, that defendant made the statement "If I can't have you no one can" and the gun fired; that Brecht pulled another shell from his pocket and put it in the gun at which point Revell left the building through the front door. Revell decided to return and met defendant leaving. He does not recall defendant speaking to him.

Dr. Edwin Segard testified as to the autopsy findings. He

described the wound sustained by Mary Ann Brecht as extending from the mid-portion of the left chest laterally to the side of the right chest. The pattern of the shotgun wound extended across her chest at the approximate level of the breasts. He stated that a lower gaping wound was probably made by wadding or possibly clothing.

J. W. Reineking, Sr., was qualified as a ballistic and gun expert and testified for the defendant. Reineking testified as to his examination and observations at the scene of the homicide; and, that markings on the top of the bar at the Ten Inn were caused by a charge of shot striking the bar. He described the wound suffered by Mary Ann as not the usual shotgun pattern at the distance at which it had occurred. He described a series of tests that he conducted in which he duplicated the wound pattern by a ricocheted or deflected shot. Reineking testified to measurements and calculations made by him and that a deflected shot pattern would strike 49 to 50 inches in height from the floor and calculated on the victim's height would produce the wound. He further testified that in his opinion it would be impossible that the gun was pointed directly at Mary Ann Brecht.

The record demonstrates no significant disagreement as to the events prior to the discharge of the shotgun the first time. John Strecker's impression was contrary to defendant's testimony but neither was it in agreement with owner Bill Revell's, whose version was the most damaging to the defendant. Revell agrees the gun was on top of the bar with defendant's hands on it but disagrees as to the position of the gun and the statement attributed to the defendant just prior to the discharge of the shotgun. The witnesses had departed the bar when the second shot was fired but they disagree with defendant's story that he was trying to eject a shell as they departed.

Dr. Segard's testimony together with the reconstruction by gun expert Reineking, appears to support defendant to the extent that their testimony together is consistent with a .deflected shot and confirms that the gun was not pointed at the deceased.

Sandra Brumfield, 18 year old sister of the deceased, was allowed to testify to a telephone conversation on April 29, 1967, between the defendant and his wife. She testified she overheard the conversation on an extension phone in the kitchen of her mother's home where both she and the deceased were residing at the time. She testified she answered the telephone, recognized the defendant's voice as the caller and at his request called Mary Ann to the phone. She then picked up the telephone extension and listened to the conversation between the defendant and his wife, Mary Ann. Her testimony as to this conversation was:

"Q. And what did you do then? A. I went to the kitchen and lifted the receiver on the other phone. * * *

"Q. Do you recall why you went to that other telephone and picked it up? A. I just went out and picked it up."

Over objection by counsel, she testified as to the conversation she listened in on and testified as to a "threat":

"Q. What did you hear at that time, Miss Brumfield? A. They were arguing.

"Q. Who was arguing? A. Mary Ann and Bob.

"Q. Do you recall specifically overhearing any particular words at that time? A. He made a threat.

"Q. And what was that threat? A. He said 'I got my shotgun out of hock, I am coming down and I will use it if I have to.'

"Q. Did you hear any more after that? A. No, I hung up."

Although defendant raises numerous issues for review, there is one controlling issue that requires a new trial. Additionally, since a new trial will be required under our ruling herein, one other issue will be briefly discussed to avoid possible error on the new trial.

 We hold that the admission of Sandra Brumfield's testimony concerning the telephone conversation between defendant and his wife, which she overheard while listening on the extension phone, constitutes prejudicial and reversible error. Admission of this testimony violated the defendant's Fourth

Amendment rights under the federal constitution as applied to state court criminal proceedings under the ''due process' clause of the Fourteenth Amendment. It equally violated defendant's rights under Article III, Sec. 7 of the Montana Constitution. State ex rel. Samlin v. Dist. Ct., 59 Mont. 600, 198 P. 362; State ex rel. King v. Dist. Ct., 70 Mont. 191, 224 P. 862. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed2d 576, established the principle that the ''search and seizure'' provisions of the Fourth Amendment to the United States Constitution protects persons and their rights to privacy and is not confined to trespass against property rights. *Katz* also established that Fourth Amendment violations also offend Fifth Amendment guarantees against self-incrimination. See also Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453. The state admits this, but contends the protection is afforded only against violations by law enforcement officers and not against violations by private citizens.

We think not. The violation of the constitutional right to privacy and against compulsory self-incrimination is as detrimental to the person to whom the protection is guaranteed in the one case as in the other. To distinguish between classes of violators is tantamount to destruction of the right itself. This Court in 1952, in a civil case not involving state or federal governmental agents or activity, recognized this principle in the following passage from Welsh v. Roehm, 125 Mont. 517, 523, 524, 241 P.2d 816, 819:

''Continuing, the article announces: 'The common law has always recognized a man's house as his castle, impregnable, often, even to its own officers engaged in the execution of its commands.'

''The 'right of privacy' is embraced within the absolute rights of personal security and personal liberty. Pavesich v. New England Life Ins. Co., 122 Ga. 190, 50 S.E. 68, 69, 69 L.R.A. 101, 106 Am.St.Rep. 104.

''*The basis of the 'right of privacy' is the 'right to be let*

*alone' and it is 'a part of the right of liberty and pursuits of happiness* * * *.'* Barber v. Time, Inc., 348 Mo. 1199, 159 S.W.(2d) 291, 294.

" 'The type of cases in which the right of privacy has been recognized vary so widely that it might be concluded that this supposed right is nothing more than a catch-all to take care of the outer fringes of tort and contractual liability, and that it is not the product of any underlying general principle. The typical privacy cases are those involving the display, sale or publication of one's portrait, the public use of one's name, oppressive publicity in connection with the collection of debts, and wire-tapping and other forms of eavesdropping. Superficially, these cases may seem to involve entirely different principles and considerations. Yet, there is a pervading element, common to all the cases, of outraging one's feelings by depriving him of the privacy which most normal persons desire and have a right to demand, whether this deprivation is effected by publishing one's name or picture in an advertisement or by *tapping one's telephone line or installing a detectophone so as to listen secretly to one's conversations with family or friends.'* 138 A.L.R. 25, see annotation." (Emphasis supplied.)

This Court in the present case would be remiss were it not to recognize that evidence obtained by the unlawful or unreasonable invasion of several of the constitutionally protected rights guaranteed to its citizens by both the federal and Montana constitutions properly comes within the contemplation of this Court's exclusionary rule. To do otherwise would lend Court approval to a fictional distinction between classes of citizens: those who are bound to respect the Constitution and those who are not. Were the exclusionary rule to recognize such distinctions it would by indirection circumvent the rule established by this Court to enforce these rights and would in fact render the rule and the constitutional guarantees it protects meaningless.

Improperly admitted evidence must also be evaluated to determine if it contributed to the conviction of the defendant and was

272

a violation of a substantial right of the defendant. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; State v. Gallagher, 151 Mont. 501, 445 P.2d 45.

We find this evidence meets the standard above, was prejudicial and requires a new trial.

 Previously we have said that one further issue would be discussed to avoid possible error on a new trial. Sheriff Paul Kober testified that he did not advise defendant of his constitutional rights at the time of his arrest. The sheriff was allowed to testify to the following questioning:

"Q. Did you say anything? A. I did.

"Q. What was that? A. I said, 'Where is the gun?'

"Q. And what was Mr. Brecht's response to that? A. He said, 'I don't have a gun.'

"Q. Did you say anything else to him? A. Yes, I did.

"Q. What? A. I said, 'Did you have to kill her?'

"Q. And what was Mr. Brecht's response to that? A. He said, 'I didn't kill anybody.' "

As to the foregoing testimony, no objection was made. However, state's counsel should refrain from using statements made prior to constitutional warnings except under unusual situations. The mandatory rules laid down in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 725, hold that a suspect while in custody or otherwise deprived of his freedom of action in any significant way must be advised as to the following rights:

1. Right to remain silent.

2. Anything said may be used against him.

3. Right to have an attorney present during questioning.

4. That if suspect could not afford to employ counsel, the Court would appoint counsel to represent suspect.

In *Miranda* the Supreme Court went on to say:

"The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any

statement made by the defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. *Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements to be merely 'exculpatory'. If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.''* (Emphasis supplied.)

As stated in *Miranda* a truly exculpatory statement would never be used by the prosecution. This evidence tends to impeach the defendant's testimony at trial that the shooting was accidental and infers he lied to the officers and would do likewise at trial.

Although our decision herein turns upon the error in admitting Sandra Brumfield's testimony, we discuss the foregoing testimony of Sheriff Kober as inadmissable under *Miranda* in order to prevent error on retrial.

For the foregoing reasons, the judgment of the district court is reversed and this cause remanded there for a new trial.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICE HASWELL, concur.

MR. JUSTICE CASTLES, (dissenting):

I dissent.

As to the testimony of Sandra Brumfield, the transcript reveals:

274

"Q. Does the date of April 29th, 1967, have any particular significance to you? A. It was Park City Junior-City Prom night.

"Q. Was there anything else that occurred on that day that you recall? A. A telephone call.

"Q. Beg pardon? A. A telephone call.

"Q. Miss Brumfield, are you related in any way or were you to Mary Ann Brecht? A. Yes.

"Q. And what is that relationship? A. She was my sister.

"Q. Do you know Robert Brecht? A. Yes.

"Q. Have you from time to time stayed in the home of Mr. Brecht and your sister during their marriage? A. Yes.

"Q. For what purpose was that? A. To be with them and to baby sit for them.

"Q. What other significance does the 29th day of April, 1967, have to you? A. A telephone call.

"Q. Where was that, did you receive a phone call? A. Yes.

"Q. And where were you when you received the phone call? A. At home in Park City.

"Q. And who was making that phone call? A. Robert Brecht.

"Q. Had you spoken with him on prior occasions on the telephone? A. Yes.

"Q. Did you know positively that that was Robert Brecht on the telephone? A. Yes.

"Q. And what did Mr. Brecht ask? A. He asked to speak to my sister, Mary Ann.

"Q. Beg pardon? A. He asked to speak to Mary Ann.

"Q. And what did you then do? A. I called her to the phone.

"Q. Did she take the phone? A. Yes.

"Q. Did you speak to Mr. Brecht? A. Yes.

"Q. And what did you do then? A. I went to the kitchen and lifted the receiver on the other phone.

"Q. Was this in your home? A. Yes.

"Q. Were there two telephones or a telephone and an extension in that home? A. Yes.

"Q. And was that at Park City? A. Yes.

"Q. Do you recall why you went to that other telephone and picked it up? A. I just went out and picked it up.

"Q. What did you hear?

"MR. HEARD: I object, Your Honor, there is no foundation laid here. The call was not made to this person, any testimony she gives, speech, would be hearsay; the speech or conversation was not addressed to that lady, no foundation sufficiently laid to show that it was Robert Brecht on the telephone that evening.

"THE COURT: Overruled.

"Q. What did you hear at that time, Miss Brumfield?" A. They were arguing.

"Q. Who was arguing? A. Mary Ann and Bob.

"Q. Do you recall specifically overhearing any particular words at that time? A. He made a threat.

"Q. And what was that threat? A. He said, 'I got my shotgun out of hock, I am coming down and I will use it if I have to.'

"Q. Did you hear any more after that? A. No, I hung up.

"MR. BLENKNER: Thank you, that's all I have, your Honor.

"MR. HEARD: I believe the Defense has no questions of this witness, Your Honor."

The only objection of counsel was on foundation. Counsel brought out in its case-in-chief testimony from Robert Brecht concerning the same telephone call, but a little different version, about an argument and telling the deceased off with some profanity.

What all this amounts to is a mere over-hearing of matters which the defendant seeks to keep secret. Sandra was in her own home, was called by the defendant, and, under such circumstances where the defendant could not reasonably expect complete privacy. This is a far cry from an invasion of privacy, as discussed in *Katz* and the other federal cases cited in the majority opinion. Even under the most stringent federal cases, this amounts to nothing more than an over-hearing of a conversation with no invasion of privacy involved.

Objection of counsel, quoted in full above, recognized this. Thus, I do not agree that this was reversible error.