MR. JUSTICE SHEEHY
delivered the opinion of the Court.
The State of Montana appeals from an order of the District Court, Thirteenth Judicial District, Carbon County, granting defendants’ motion to suppress all evidence resulting from an unreasonable search and seizure.
On February 25, 1980, defendants were charged with alternative counts of felony theft — either having stolen a pair of Rossignol SM Equipe skis on January 12, 1980, or having possessed them on February 21, 1980, knowing that they were stolen. The charges arose when skis, belonging to Buzz Welch, were found in defendants’ residence and seized by officers of the Carbon County sheriff’s office pursuant to a search warrant issued by the local justice of the peace. The issuance of the warrant was based on af *54 fidavits of Welch, who said his skis had been stolen, and of Kurt Hallock and Jack Marcure, who stated they had seen the skis at defendants’ rented home in Red Lodge, Montana. The circumstances surrounding the latter affiants’ discovery must be closely scrutinized in this appeal.
The defendants and affiants were all employed in various capacities at Red Lodge Ski area. During the 1980 ski season, a rash of ski thefts were reported, including two thefts reported by Welch and Marcure. The skis reported stolen by Welch and Mar-cure were identical except in length, binding type and serial number. After discussing the missing skis with numerous acquaintances, Hallock formed the opinion that the skis were in the possession of the defendants at their rented home.
The defendants were tenants in a residence owned by Mr. Prather. The residence was listed for sale through the Marshall Real Estate Agency. The real estate agent in charge of selling the house was Barbara Marshall. Defendant Hyem was aware that she had keys to the house and had shown it to prospective purchasers in his absence.
In the off-season, Hallock and Marcure purchase and remodel old houses and had previously done business with Marshall. Aware that the house was on the- market, they contacted Marshall and asked to be shown the house. Hallock testified that he wanted to tour the house both for business reasons and to search for the skis, while Marcure’s sole purpose was to search for the stolen Rossignols.
At the hearing, only Hallock and Marshall were called as witnesses. Hallock testified that during inspection of the premsises, Marcure dropped his sunglasses beside a bed, and then saw the skis thereunder. Marcure removed the skis halfway from under the bed and found that the serial number matched that of Welch’s missing skis. Hallock stated that only by pulling the skis out from under the bed could the serial number and positive identification be ascertained. Hallock further testified that until Marcure pulled the skis out, he was unable to see any part of the skis.
*55 Marshall testified that upon entering the house she admonished Hallock and Marcure not to touch any personal property contained therein. She further testified that her observation of the bedroom area disclosed that only the tips of the skis were visible beneath the bed.
After completing a tour of the house, Hallock and Marcure reported their discovery to the Carbon County attorney’s office, which in turn applied for and received a search warrant.
On motion of defendants, the District Court agreed that the evidence had been obtained by an unreasonable search, and ordered the evidence suppressed. It is from that order that the State appeals.
The issues to be considered on appeal are: (1) Whether the citizen search violated the defendants’ right of privacy; and, (2) Whether defendants consented to the search and thereby waived their right of privacy.
Montana’s constitution must be read as a whole and its separate sections interpreted in relation to one another. Unlike the federal constitution, our constitution particularly provides for an individual’s right of privacy in 1972 Mont.Const., Art. II, § 10, which states: “The right of individual privacy is essential to the well being of a free society and shall not be infringed without the showing of a compelling state interest.”
Application of this right is as diverse as the components which make up a free ordered society. Inasmuch as a citizen’s personality and thoughts are protected as private, so are a citizen’s physical solitude and right to be let alone. Moreover, 1972 Mont.Const., Art. II, § 11, which mirrors the Fourth Amendment to the United States Constitution, states that:
“The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.” (Emphasis added.)
*56 A warrantless search is per se unreasonable, unless it falls within one of the defined exceptions to the warrant requirement. Coolidge v.New Hampshire (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. Before the warrantless search, neither Hallock nor Marcure could have obtained a valid search warrant because they were not possessed of their own knowledge, or through demonstrably reliable informants, of facts sufficient to establish probable cause, an essential ground for the issuance of a warrant. Section 46-5-202(1 )(b), MCA. This warrantless search does not fall within any of the exceptions to a warrant requirement, which exceptions arise out of exigent circumstances necessary to protect or preserve life or to avoid serious injury (see, Wayne v. U.S. (D.C.Cir.1963), 318 F.2d 205), or arise from the evanescent nature of that material seized. Terry v. Ohio (1968), 392 U.S. 1, 88 S.CT. 1868, 20 L.Ed.2d 889; Schmerber v. California (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.
Since the warrantless search here was per se unreasonable, it was unconstitutional under our federal and state constitutions, and therefore unlawful. It violated the Fourth Amendment of the United States Constitution, and also 1972 Mont.Const., Art. II, § 11.
In addition, the warrantless search violated the defendants’ rights of privacy under the 1972 Mont.Const., Art II, § 10, which we have quoted previously. Here, rights of individual privacy were infringed without the showing of a compelling state interest. Since Hallock and Marcure were acting in their individual capacities, and not for the state, state action was not involved, and the searchers could never be in a position of showing a compelling state interest. Under the 1972 Montana Constitution, the only exception to the restriction against the invasion of .individual privacy is a compelling state interest. The private parties here, acting on their own hook, could not establish a compelling state interest.
The right of individual privacy, the right to be secure in one’s home, was prized in Montana even before the adoption of the 1972 Montana Constitution. In Welsh v. Roehm (1952), 125 Mont. 517, *57 241 P.2d 816, it was held valuable enough to support a verdict of punitive damages without general damages against the invaders of a tenants’ possessory rights. In State v. Brecht (1971), 157 Mont. 264, 485 P.2d 47, this Court applied the exclusionary rule to a telephone conversation of the defendant, overheard by an interloper on an extension line. In that case, this Court found that the right of individual privacy was adequately expressed, though penumbrally, in 1889 Mont.Const., Art. 3, § 7, which read as follows:
“Section 7. The people shall be secure in their persons, papers, homes, and effects, from unreasonable searches and seizures and no warrant to search any place or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, nor without probable cause, supported by oath or affirmation, reduced to writing.”
In Brecht, it was pointed out that there cannot be a fictional difference between classes of citizens: those who are commanded to obey the constitution and those who are not. Our constitutional prohibition against unreasonable invasion of privacy applies to all persons, whether acting for the state or privately.
The policy to set a special store on the right of privacy was expressly enunciated in the 1972 Mont.Const., Art. II, § 10, and the implementation of that policy was continued by this Court, in State v. Helfirch (1979), 183 Mont. 484, 600 P.2d 816, 36 St.Rep. 1763. There we upheld the suppression of evidence gathered by a private citizen who entered a fenced garden to obtain a sample of growing marijuana, which the citizen turned over to the authorities. There was no showing in Helfrich, as there is no showing at the case at bar, that the private citizen was acting in concert with the police authorities. Nevertheless, we held the suppression of such evidence proper. Here, we have nearly the same situation, except that Hallock and Marcure gained entry to the defendants’ rented premises on an ostensibly legitimate excuse, to view the real property as prospective purchasers. We cannot see that a citizen gaining entrance to otherwise private property by a *58 ruse is in any better position to obtain incriminating evidence against a lawful. possessor (as distinguished from a guest or licensee) of that property than one gaining entrance by trespass. The result in each case is the same — invasion of the possessor’s private property. Under Helfrich, therefore, the evidence resulting from the unreasonable search of the premises by private citizens is illegally obtained, and must be suppressed. When private citizens, acting on their own initiative, unreasonably invade the privacy rights of individuals, the evidence thus obtained against the other individuals is subject to the exclusionary rule. This is the teaching of Helfrich, supra.
The State argues that evidence obtained by a private citizen should be suppressed only if it was obtained in an “illegal manner.” We understand the essence of that argument. The State means that the evidence should be suppressed only if the evidence was obtained in violation of statutory law. The argument, however, overlooks that searches and seizures which, though they may not violate statutory law, may nevertheless be unreasonable in the constituitonal sense, and therefore, unlawful. In State v. Coburn (1974), 165 Mont. 488, 530 P.2d 442, we stated that the everincreasing presence of private police, coupled with a ctizen’s ability to arrest, mandated that the private sector be subject to the same constitutional scrutiny as the public sector. Thus, the actions of Hallock and Marcure in the present case must be measured against a standard of reasonableness to determine if they violated defendants’ right of privacy. This brings us back to what we said at the outset of this discussion, that a warrantless search is unreasonable per se unless the search falls within one of the defined exceptions. The search being unreasonable, and the rights of privacy having been invaded thereby, the unconstitutional invasion of the defendants’ rights of privacy was an unlawful act.
Thus it is that on two counts, a violation of the state and federal constitutions on searches and seizures and a further violation of the state constitutional right of privacy, the evidence produced herein is subject to the application of the exclusionary rule.
*59 The exclusionary rule has been the subject of considerable legislative and editorial discussion in recent months. Perhaps not well-known is the fact that the United States Supreme Court first announced that rule 67 years ago in Weeks v. United States (1914), 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed.652, where the use of evidence obtained in violation of the Fourth Amendment was barred in federal prosecutions. After Silverthorne Lumber Company v. United States (1920), 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed.319, the rule came to be known as the “fruit of the poisonous tree” doctrine. In 1961, the United States Supreme Court, in Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, made the exclusionary rule fully applicable to the states under the Fourteenth Amendment. The “poisoned fruit” rule was recognized by this Court in dictum in State v. Yoss (1965), 146 Mont. 508, 409 P.2d 452.
The exclusionary rule grew out of the writings of some of the most esteemed men ever to occupy seats on the United States Supreme Court, including Justice Oliver Wendell Holmes, and Justice Louis Brandéis. They became aghast at the long train of cases where federal agents had ignored constitutional protections in obtaining evidence, and had been willing to perjure themselves as if they had not so acted, Holmes said:
“The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source, they may be proved like any others, but the knowlege gained by the government’s own wrong cannot be used by it in the way proposed.” Silverthorne, supra, 251 U.S. at 392, 40 S.Ct. at 183.
Justice Brandéis said:
“. . .If the government becomes a lawbreaker it breeds contempt for law . . .” Olmstead v. U.S. (1928), 277 U.S. 438, 483-485, 48 S.Ct. 564, 574-575, 72 L.Ed. 944.
*60 At first the exclusionary rule applied only in the federal courts, in federal prosecutions. It was not applied in the states. This duality of application resulted in anomalies. For example, in State v. District Court, et al. (1928), 82 Mont. 515, 268 P. 501, the Montana court held that the provisions of the federal constitution against unreasonble searches and seizures had no application to state officers. In that case, federal officers had violated the constitutional rights of a person by opening a package sent through the mail containing the drug morphine. The sheriff arrested the addressee and seized the package on information imparted to him by the federal officers as to its contents. The sheriff was not acting in cooperation or collusion with the federal officers. This Court held that the seizure in that mode did not render the package inadmissible in evidence, under the state constitution, and held that the District Court, in suppressing the evidence, committed error.
Thus, the prosecution was able to use evidence in a state court prosecution that would have been barred in a federal prosecution at that time.
If the result in the 1928 Montana case now seems incongruous, be assured that Montana was not alone in its incongruity. In Irvine v. California (1954), 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed.561, a case involving police misconduct so outrageous so as to be “almost incredible if it were not admitted,” the Supreme Court did not impose the exclusionary rule on the state, even though the misconduct was extreme. Irvine, supra. Until the time of Mapp, supra, more than twenty states were still admitting illegally-seized evidence.
California, it should be noted, was one of the states that adopted the exclusionary rule before the holding in Mapp. It changed its judicial mind between the time, in 1942, when it held that illegally-seized evidence was admissible (People v. Gonzalez (1942), 20 Cal.2d 165, 124 P.2d 44) and the case adopting the exclusionary rule in 1955 (People v. Cahan (1955), 44 Cal.2d 434, 282 P.2d 905). The California court could no longer stomach the situation where “law enforcement officers . . . casually regarded [illegal searches and seizures] as nothing more than the perform *61 anee of their ordinary duties ...” 282 P.2d at 907. Its Chief Justice, Roger Traynor, later wrote in 1962:
“My misgivings about . . . [the admissiblity of illegally-seized evidence] grew as I observed that time after time it was being offered and admitted as a routine procedure ... It was one thing to condone an occasional constable’s blunder, to accept his illegally obtained evidence so that the guilty would not go free. It was quite another to condone a steady course of illegal police procedures that deliberately and flagrantly violated the constitution of the United States as well as the state constitution.
“Ah, but surely the guilty should still not go free? However grave the question, it seemed improperly directed at the exclusionary rule. The hard answer is in the United States Constitution as well as in state constitutions. They make it clear that the guilty would go free if the evidence necessary to convict could only have been obtained illegally, just as they would go free if such evidence were lacking because the police had observed the constitutional restraints upon them. It is seriously misleading, however, to suggest that wholesale release of the guilty is a consequence of the exclusionary rule. It is a large assumption that the police have invariably exhausted the possibilities of obtaining evidence legally when they have relied upon illegally obtained evidence. It is more rational to assume the opposite when the offer of illegally-obtained evidence becomes routine.” Traynor, Mapp v. Ohio At Large in the Fifty States (1962), Duke L.J. 319, 321, 322. (Emphasis added.)
The exclusionary rule is not a judicial plaything, casually adopted and casually waived. It is a constitutional answer to unconstitutional activity. It is an affirmation that a free government can no more tolerate the unlawful activities of its agents than crime in the streets. It is paste and cover for the bones of our individual constitutional rights, without which such rights were in danger of becoming an unfleshed skeleton.
Sometimes, it is to be admitted with the deepest regret, the result of the exclusionary rule is that the guilty criminal goes free. That is the price of liberty. It is irrefutable that many times criminals go *62 free because officers are careful to act constitutionally. There is no judicial logic in contending that they should not go free when officers act unconstitutionally.
An important distinction must be made in this case, however, because here the unreasonable search was made not by police officers but by private individuals. The State has pointed out to us that Mapp v. Ohio, supra, extended the operation of the Fourteenth Amendment, and the application of the exclusionary rule to state cases, but only when state action is involved. This is necessarily true because of the provisions of the Fourteenth Amendment, which apply only to states and not to individuals. As we have pointed out above, however, Montana applies the exclusionary rule to actions by individuals where the state constitution has been violated. Brecht, surpa; Helfrich, supra. The wisdom of that course should be obvious: the Montana law applies equally to agents of the state and to private individuals. We have no duality of rights, one set of laws operating when state action is involved, and another set of laws applying when private action is involved; we avoid such anomalies as may occur when private individuals act for, but not in concert or collusion with police officers. We have not adopted a course of legal schizophrenia. An across-the-board application of the exclusionary rule results in a clear equality of result, and does not depend upon fortuitous circumstances which might excuse in one situation a violation of constitutional rights, and discountenance such violations in another situation.
The second part of the issues to be considered here is whether the defendants here consented to the search which was made and thereby waived their right of privacy. This involves the determination and application of standards for the invasion of privacy.
Privacy has been defined as the ability to control access to information about oneself. Fried, Privacy (1968), 77 Yale L.J. 475, 482, 483. In Katz v. U.S. (1924), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, the Supreme Court determined under the federal constitution that privacy is protected if the defendant has an actual subjective expectation of privacy and that expectation is objective *63 ly reasonable. Therefore, what is sought to be preserved as private, even in an area accessible to the public, may be constitutionally protected. See, Rios v. United States (1960), 364 U.S. 253, 30 S.Ct. 1431, 4 L.Ed.2d 1688.
The defendants were aware that their rented house was for sale and being shown to prospective buyers in their absence. The defendants, therefore, could not have a reasonable expectation of privacy in the areas of the house which are normally subject to inspection by prospective purchasers. The skis, however, were personal property, not for sale, and not items which are normally the subject of inspection by house buyers. Even though the bedroom was accessible to the public, by placing the skis under the bed, out of the public’s view,. defendants sought to preserve the skis as private and, thus, be afforded constitutional protection. We find that such an expectation of privacy is reasonable.
The search was conducted by private citizens not acting in concert with any law enforcement agency, thus precluding the assertion of a compelling state interest. 1972 Mont.Const., Art. II, § 10. It is undisputed that Marcure’s sole purpose of inspecting the house was to search for the skis. The premises were open to inspection by prospective purchasers, not persons attempting to dispel or substantiate rumors. From the outset, Marcure was improperly on the premises in an unreasonable invasion of defendants’ expectation of privacy. Moreover, by removing the personal property from underneath the bed and inspecting it, both Hallock and Marcure went beyond their legitimate purpose for being on the premises against the admonition of the real estate agent, and they thereby violated defendants’ right of privacy.
The skis were seized by police pursuant to a search warrant which was issued based on the affiants’ discovery of the skis. The only way Hallock and Marcure could positively identify the skis was by removing them from under the bed and checking the serial numbers. This action was an unconstitutional violation of defendants’ right of privacy. In the absence of a positive identification of the skis, it is unlikely that Hallock’s mere suspicion would *64 justify the issuance of a search warrant. Therefore, the evidence was properly suppressed as fruit of an unreasonable search and seizure.
The State takes the position that by consenting to allow the house to be shown to prospective purchasers, defendants waived their right of privacy. In Johnson v. Zerbst (1938), 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, waiver is defined as “an intentional relinquishment or abandonment of a known right or privilege.” Thus, if a consent search is a matter of waiver, then the consent would be effective only upon a showing that the individual who purportedly consented, agreed to the search that occurred. Here the defendants did not consent to a search and seizure of the personal property in their possession.
Accordingly, we affirm the judgment of the District Court in suppressing the evidence.
MR. CHIEF JUSTICE HASWELL and JUSTICES DALY and SHEA concur.