MR. JUSTICE SHEEHY,
dissenting:
Today’s opinion has derailed the one vehicle that gave strength and vitality to the unique right of privacy enshrined in our State Constitution. Our state right of privacy had meaning and force in our lives because this Court excluded evidence obtained in violation of privacy. Until today it was the proud accomplishment of this Court, in the several cases today overruled, that enhanced by judicial decision what the framers proclaimed, that “the right of individual privacy is essential to the well being of a free society, and shall not be infringed without the showing of a compelling state interest.” Today the vigor of that ringing proclamation has been drained, leaving it merely a hortative form of words.
The devastation is complete. The immediate effect of today’s opinion is to advise tenants that their right to be “secure in their persons, papers, homes, and effects” is subject to the whims of their landlords. But by limiting the application of our constitutional privacy right to state action only, the larger effect of today’s decision is to cut the underpinnings from any future claim on invasion of privacy tort under the State Constitution. From today, unless state action is involved a tort claim between individuals for invasion of pri *74 vacy may not be based on Art. II, section 10 of our State Constitution, but must instead be found in the common law. Tragically, it was not necessary for such a broad sweep of legal decision to set aside the exclusionary rule. In their zeal, the new majority rolled out a cannon to shoot a fly.
The majority opinion today results from a series of misconceptions that distort the reasoning of our previous cases. One such misconception is that we have held that the exclusionary rule is “rooted” in the Constitution. A second misconception leads the majority to conclude the right of privacy guaranteed by the State Constitution applies only to state action. A third misconception concerns the earlier dissents of the same justices who are now part of the new majority on the exclusionary rule.
It is a given that there is no textual support in our State Constitution for the exclusionary rule. Nowhere, and particularly not in Art. II, section 10, is there found the language “evidence obtained in violation of this section shall be excluded in the courts.” But the same is true of the Federal Constitution. We search in vain for the words “right of privacy” in the express provisions of the Federal Constitution. The United States Supreme Court has dug that right out of the “penumbras” of the Bill of Rights. (At oral argument, the Attorney General of this State seemed unwilling to admit such penumbras.) In Griswold v. Connecticut (1965), 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510, it is said:
“The foregoing cases suggest that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance (citing authority). Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one, as we have seen. The Third Amendment, in its prohibition against the quartering of soldiers ‘in any house’ in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the ‘right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures.’ The Fifth Amendment in its Self Incrimination Clause enables a citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: ‘The enumeration in Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.’
“The Fourth and Fifth Amendments were described in Boyd v. *75 United, States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, as protection against all government invasions ‘of the sanctity of a man’s home and the privacies of life.’ We recently referred in Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081, 1090, to the Fourth Amendment as creating a ‘right to privacy, no less important than any other right carefully and particularly reserved to the people . . .’ “ 381 U.S. at 484-485 [85 S.Ct. at 1681-82].
This Court said in State v. Hyem (Mont. 1981), 630 P.2d 202, 208, 38 St.Rep. 891, 897, that the exclusionary rule “is a constitutional answer to unconstitutional activity.” I insist on the integrity of that statement. That the exclusionary rule is constitutionally required, as distinguished from mandated, is supported by Justice Clark who said in Mapp v. Ohio (1961), 367 U.S. 643, 648, 81 S.Ct. 1684, 6 L.Ed.2d 1081, that the exclusionary rule is “that command which this Court has held to be clear, specific, and constitutionally required — even if judicially implied — deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to a ‘form of words’ . . .”
Contrary to the misconception of the majority, Hyem held not that the exclusionary rule was a constitutional right but a constitutional answer. It is a rule in accord with Art. II, Section 16, Montana Constitution, that a speedy remedy be afforded “for every injury to person, property, or character.”
The exclusionary rule is the only practicable “speedy remedy.” Criminal prosecutions for deprivations of constitutional rights are limited to “willful” violations. Screws v. United States (1945), 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495. An injunction against violations cannot be obtained unless the party can establish he is likely to be injured by the practices again in the future. City of Los Angeles v. Lyons (1983), 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675. A civil action against a violator for damages is so obviously impracticable that it needs no discussion.
In view of the fruitlessness of other remedies, any lawyer worth his salt must admit the exclusionary rule is the only effective remedy that will protect against unconstitutional intrusions on privacy by busybodies or snitches.
We were treated by the State in oral argument in this case to a list of frightening possibilities under our exclusionary rule. What, we were asked, would the implications of the exclusionary rule be if the landlord in this case had found a body? The answer of course is simple: A body cannot be suppressed, any more than the body of a *76 prisoner can be suppressed after an illegal arrest. But the exclusionary rule should be applied with might and main when any lesser evidence of criminal conduct is produced through unlawful intrusions into one’s privacy, for all of the reasons usually expressed: the growth of technology in electronic eavesdropping; governments should not cooperate with unlawful intruders; no price can be placed on a constitutional right; the exclusionary rule should not depend on the fortuitous circumstance of who and of what quality was the intruder; judicial integrity is involved; and unlawful intrusions should not be encouraged.
Ah, but should the guilty go free? Emphatically yes, where the only evidence of guilt results from an invasion of the home or private precincts of the individual. Only the cases where the intruder discovers criminal activity get into the courts. There must be tens of instances of unlawful intrusions into privacy which do not turn up criminal cases, for most of us obey the laws. The opportunity for courts to stress the heightened privacy right found in our State constitution will only come in cases, like all other cases on constitutional rights, involving not very nice people. The right of all of us to our privacy weighs greater than the occasional and rare loss of conviction of a criminal. Essentially it preserves judicial integrity for the government not to act in concert with lawbreakers to convict other lawbreakers.
A second misconception of the majority is that the state constitutional right of individual privacy was intended by the framers to be a wall against state action only.
As laws usually reflect the will of the people on social, moral and economic issues, so too do constitutional provisions. The state framers in 1972 were not so far removed from pioneer days in Montana as to have forgotten our traditions of independence and privacy. Even the western usage of hospitality and welcome in remote places for the hungry wayfarer did not displace the duty of the wayfarer to respect the person, home and property of his host. The spirit of neutrality about our neighbor’s business was captured by the long-forgotten poet who described the Montana he loved:
With skies that reach from east to west
And room to go and come
I liked my fellow man the best
When he was scattered some.
*77 That spirit had found its way into the decisions of this Court before the 1972 constitutional convention. In State v. Brecht (1971), 157 Mont. 264, 485 P.2d 47, this Court said:
“. . . The state admits this, but contends that protection is afforded only against violations by law enforcement officers and not against violations by private citizens.
“We think not. The violation of the constitutional right to privacy and against compulsory self incrimination is as detrimental to the person to whom the protection is guaranteed in one case as in the other. To distinguish between classes of violators is tantamount to destruction of the right itself. This Court in 1952, in a civil case not involving state or federal governmental agents or activity, recognized this principle in the following passage from Welsh v. Roehm, 125 Mont. 517, 523, 524, 241 P.2d 816, 819:
“ ‘Continuing the article announces: ‘The common law has always recognized a man’s house as his castle, impregnable, often even to its own officers engaged in the execution of his commands.’ “
“the ‘right of privacy’ is embraced within the absolute rights of personal security and personal liberty (citing authority.)
“ ‘the basis of the right of privacy is ‘the right to be let alone’ and is ‘a part of the right of liberty and pursuits of happiness.’ (Citing authority.)” 157 Mont. at 270, 271, 485 P.2d at 50, 51.
Contrary to what is stated in the majority opinion, the constitutional framers certainly contemplated that Art. II, Section 10 would be applicable to private as well as state action. In addition to the statement of the delegate quoted in the majority opinion (page 7, supra) that same Delegate Campbell continued:
“. . . we feel that this, as a mandate to our government, would cause a complete reexamination and guarantee our individual citizens of Montana this very important right — the right to be let alone; and this has been called the most important right of them all. You all had placed on your desk the Montana Standards’ editorial of February 3, 1972.1 think it states it very well. ‘Times change. That, in a nutshell, is why the Constitutional Convention delegates in Helena are working on a new and more modern governmental charter for Montana. Today, with wire taps, electronic and bugging devices, photo surveillance equipment and computerized data banks, a person’s privacy can be invaded without his knowledge and the information so gained can be misused in the most insidious ways. It isn’t only a careless government that has this power to pry; political organizations, private organizations, private information gathering firms, *78 and even an individual can now snoop more easily and more effectively than ever before. We certainly hope that such snooping is not as wide
spread as some person would have us believe, but with technology easily available and becoming more refined all the time, prudent safeguards against the misuse of such technology are needed. Some may urge and argue that this is a legislative, not a constitutional issue. We think the right of privacy is like a number of other inalienable rights; a carefully worded constitutional article reaffirming this right is desirable. Wade Dahood of Anaconda, chairman of the Bill of Rights Committee, hit the nail on the head when-he said: ‘As government functions and controls expand, it is necessary to expand the rights of the individual.’ The right to privacy deserves specific protection. Mr. Chairman, I would recommend adoption of this section.”-Montana Constitutional Convention, Verbatim Transcript, Volume 5, at 1681.
Beyond cavil, in the light of the holding in State v. Brecht, supra, which we must assume the framers knew about, and the direct statement of the delegate proposing Art. II, Section 10 for constitutional adoption, a clear intention existed to guarantee individual privacy in Montana from and after 1972 against both state and private action.
State v. Solis (1984), [214 Mont. 310,] 693 P.2d 519, is not authority from this Court regarding the effect of state action under the Privacy Clause. The case involved warrantless videotaping by police officers in a “sting” operation. In excluding the videotapes, two Justices based their opinion on a right of privacy in a “sting” operation. Three Justices concurred in the result only because they saw the case as an illegal search without a warrant based on federal law. They did not discuss privacy. Two other Justices dissented and would have held the search valid. The Justices who saw a privacy issue in the case under the Privacy Clause relied on our earlier holdings in Hyem and Van Haele, which are today overruled.
Perhaps the most telling argument against the State-action-only interpretation of our privacy clause is that the framers gave us a toothless clause if all they intended to cover was state action. Interpreted as a majority today interprets our state privacy clause, it is but the functional equivalent of what is minimally guaranteed to us in the Federal Constitution, but we are entitled to the federal minimums of privacy with or without the Montana Constitution. The Fourteenth Amendment of the U.S. Constitution has, since Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, guaranteed *79 that states would protect the privacy rights of individuals penumbrally contained in the U.S. Constitution. Those privacy rights existed and still exist before and since the adoption by Montana of Art. II, Section 10, and would exist without the State Constitution.
I maintain that the Montana constitutional framers in 1972 wanted to do more for Montanans in the field of privacy. They adopted Art. II, Section 10 to give Montanans a heightened right of privacy, beyond the privacy rights found in the U.S. Constitution. That aspiration for a heightened right meant that our State Constitution would afford privacy greater than the minimum guarantees of the Federal Constitution.
There is no force to the majority argument that the Privacy Clause should be applied only to state action because hitherto Montana stands alone in applying it to private action. Montana’s constitutional Privacy Clause is unique. No other state has a State Constitution provision exactly like it. The closest is that of Alaska in Art. I, Section 22, 1972 Alaska Constitution, which provides:
“The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section.”
In Allred v. Alaska (Alaska 1976), 554 P.2d 411, where one of the questions presented was whether statements made by a defendant to a counselor were protected by Alaska’s constitutional provision on privacy, the Alaska Supreme Court seems to assume without discussion that it would take state action to trigger the constitutional privacy guarantee.
In California, in November 1972, the voters amended Art. I, Section 1 of their State Constitution to include among the various “inalienable” rights of all people the right of “privacy.” Curiously, as far as I am aware, no California case has specifically decided whether the right of privacy in the California Code applies to private action. However, in White v. Davis (1975), 13 Cal.3d 757, 120 CahRptr. 94, 533 P.2d 222, the California Supreme Court identified the principle “mischiefs” at which the privacy right was directed, including “the overbroad collection and retention of unnecessary personal information by government and business interests.” To that extent at least, California presumably would recognize that its privacy right precludes business interests from intruding on individual privacy.
Five states, Hawaii, Illinois, South Caroline, Louisiana and Florida as of 1968 included the right of privacy in some form as a part of the traditional constitutional prohibition against unreasonable searches and seizures. See Toward A Right of Privacy, Gerald B. Cope, Jr., 5 *80 FLS.Univ.L.Rev. (1977), 633, 710-734. Our framers declined that approach.
It is noteworthy that in our 1972 Constitutional Convention, the first draft of the search and seizure provision, Art. II, Section 11, included language that “the people shall be secure . . . from unreasonable searches and seizures and invasions of privacy . . .” The delegates recognized that the modifier “unreasonable” in Section 11 weakened the right of privacy they had established in Section 10. Montana Constitutional Convention, Verbatim Transcript, Vol. 5 at 1688. The convention therefore deleted reference to privacy from Section 11.
Two other states have a constitutional provision for privacy, Washington and Arizona. Arizona treats its constitutional provision as the functional equivalent of the Fourth Amendment, Arizona v. Murphy (1977), 117 Ariz. 57, 570 P.2d 1070. Washington, however, is approaching what had been Montana’s position on the effect of its constitutional privacy provision. Art. I, Section 7 of Washington’s Constitution provides that “no persons shall be disturbed in his private affairs or his home invaded, without authority of law.” In State v. Williams (1984), 102 Wash.2d 773, 689 P.2d 1065, 1070, the Washington Court said:
“This provision differs from the federal constitution and provides heightened protection to our citizens’ privacy rights (citing authority). Where, as here, no probable cause exists to arrest the suspect, we believe that the language of Const. Art. I, Section 7 forbids police seizures of this nature.”
Although State v. Williams addressed police action, and not private action, Washington aligned itself with Montana in determining that the right of privacy afforded by its state constitution is greater than the federal mínimums.
The majority has referred to the Wyoming decision of State v. Heiner (Wyo. 1984), 683 P.2d 629, in which Wyoming identified us as the single jurisdiction that applied the right of privacy to private as well as state action. Wisely, the majority decided not to rely on Wyoming as authority in reaching its decision today. The myopic comments of the Wyoming Supreme Court respecting State v. Hyem (Mont. 1981), 630 P.2d 202, 38 St.Rep. 891, result from its conclusion that our history of the exclusionary rule vis-a-vis private action is a “somewhat tortured history.” Not tortured, but straightforward has been our line of decisions. From State v. Brecht, supra, through State v. Coburn (1974), 165 Mont. 488, 530 P.2d 442: State *81 v. Sawyer (1977), 174 Mont. 512, 571 P.2d 1131; State v. Helfrich (1979), 183 Mont. 484, 600 P.2d 816; State v. Hyem, supra; State v. Sayers (Mont. 1982), [199 Mont. 228,] 648 P.2d 291, 39 St.Rep. 1309; and State v. Van Haele (Mont. 1982), [199 Mont. 522,] 649 P.2d 1311, the course of our decisions has been straight as an arrow: Our constitutional right of privacy applied to private action. There have been dissenters, but we have not had torture.
The importance of the privacy provision to the framers can be assumed from its position in Art. II, relating to the declaration of individual rights. The privacy section preceded the provision against unreasonable search and seizures (Section 11), the right of suffrage (Section 13), the right to justice in the courts (Section 16), the right to due process (Section 17), the privilege of habeas corpus (Section 19), and the right to bail (Section 21). It preceded the right of an accused to meet his witnesses face-to-face (Section 24), the right against self-incrimination and double jeopardy (Section 25) and the right to trial by jury (Section 26). By placing the right of individual privacy before all of those other essential rights, the framers, I submit, meant to evince their intention to give a heightened right to privacy beyond the minimum rights of privacy penumbrally found in the Federal Constitution. It was within the power of the state constitutional framers so to do.
The framers in 1972 had a beautiful conception: They felt the force of our tradition that each person ought to mind his own business; they saw the home as a place of refuge, peace and security. They provided that a wall of law should be erected against all onslaught except when the compelling interest of the State demanded otherwise. Private persons do not act for the State. Intruders into privacy may be nothing more than nosy neighbors, busybodies, or snitches. The framers extended the right of privacy especially against these.
Gone is that beautiful conception. Left only are the minimum protections of the Federal Constitution, which nowhere expressly guarantees individual privacy. Federally, our privacy rights are no more than the shifting courts are inclined to allow. Under our State Constitution, our individual privacy rights are expressly stated to be paramount. The framers unfortunately did not foresee that this Court would dilute their positive declaration in Art. II, Section 10, by reading into its clear language some darkling exception. This Court has stamped “approved” on the nettlesome intruders, the nosy ones, the busy ones, the snitches. It has said welcome to the “Big Spy Country.”
*82 The third misconception of the majority is embedded in their irresolution about the nature and extent of our state Privacy Clause, as demonstrated by a comparison of the statements of the majority and their earlier dissents.
In the concluding paragraphs of the majority opinion, we are given a moment’s glimpse of the monster now penned up in the basement. It may be turned loose again if the State proposes to use evidence obtained in criminal activity.
It defies imagination how a criminal exception can be read into the clear language of Art. II, Section 10. The glaring internal inconsistency of the majority is the apparent concession that the Privacy Clause applies to private action if the private actors are criminals.
If the majority does indeed intend that criminal activity shall be the watershed in the future in determining rights under the privacy clause, it is a further sticking inconsistency that the majority glides by the criminal activity of Hultgren in this case. The landlord stands before us as a trespasser. He is indeed guilty of criminal trespass under Section 45-6-203, MCA. The offense of criminal trespass of property is committed if a party knowingly enters or remains unlawfully in an occupied structure. Section 45-6-203. A person enters or remains unlawfully in an occupied structure when he is not licensed, invited, or otherwise privileged to do so. Section 45-6-201, MCA. In State v. Dess (1979), 184 Mont. 116, 602 P.2d 142, we upheld the conviction of Dess for misdemeanor criminal trespass on his mere unlawful presence in an occupied structure. There is no way here to distinguish the criminal activity of Dess from that of Hultgren, except the possible reluctance of the county attorney to press the charge against Hultgren. The majority offer no explanation why we must wait for another day for the determination of the effect of criminal activity on the Privacy Clause. This case presents criminal activity to the Court.
For a better understanding of the irresolution of some of the majority, the reader is invited to examine their dissents in State v. Hyem, supra; State v. Van Haele, supra; and their statements in this case.
In Hyem, the court applied the exclusionary rule to exclude evidence obtained by two parties who entered a private home on a ruse in order to discover evidence of stolen property. The majority held that the Privacy Clause was violated. Justice Morrison dissented, contending without reservation that constitutions are intended to establish rights only between private persons and their government, *83 and that the exclusionary rule should not be applied where individual privacy was violated by private parties. Justices Weber and Harrison concurred in Justice Morrison’s dissent. In Hyem, Justice Daly weighed in with a stinging special concurrence, attacking the dissent for “overzealous statements” and pointing out language from State v. Coburn (1974), 165 Mont. 488, 530 P.2d 442, to effect that constitutions must be capable of adaptation to a changing world.
In Van Haele, the court ordered the exclusion of evidence produced when a private party removed the hinges from the padlocked door of a rented storage unit and entered the defendant’s unit to obtain incriminating evidence. In that case, Justice Morrison concurred, asserting again that he found no support in the privacy clause to proscribe private action but that he would “modify his position from that articulated in Hyem to apply the exclusionary rule as a rule of court procedure where “a private individual violates the penal statutes of this state.” 649 P.2d at 1319. Justice Weber concurred with Justice Morrison. In effect, Justice Morrison’s special concurrence condoned the use of the exclusionary rule as a rule of court procedure to be applied to private criminal action which violated the privacy clause.
Justice Harrison dissented in Van Haele saying that the exclusionary rule should not be used where “it is discovered by officers or private persons in a course of actions that are taken in good faith and in the reasonable, though mistaken belief that they are authorized.” 649 P.2d at 1319. Thus, Justice Harrison in effect would remove the exclusionary rule from not only the privacy clause but also the Fourth and Fifth Amendments of the Federal Constitution.
In light of the present decision, the case at bar, where is the court heading now if the present majority continues to prevail in cases involving private invasions of individual privacy which develop incriminating evidence? In Hyem, the justices would not exclude evidence if it were developed through a violation of the penal statutes. In this case, State v. Long, a violation of the penal statutes occurred, but the question of the application of the exclusionary rule under criminal activity is postponed to another day. Apparently criminal activity does not count unless the perpetrator is actually criminally charged in the courts.
A final evidence of irresolution is that today the majority has overruled Van Haele, a decision in which two of the majority justices concurred one and one-half years ago.
*84 I would adhere to our earlier cases and uphold the decision of the District Court to exclude the evidence.